**D. C. FEDERATION OF CIVIC ASSO-
CIATIONS, INC., et al., Appellants,**

v.

**Thomas F. AIRIS, as Director of the District of Columbia Department of Highways and Traffic, et al., Appellees.**

**No. 21416.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 25, 1968.

Decided Feb. 15, 1968.

See also, D.C., 275 F.Supp. 533.

Messrs. Roberts B. Owen and Gerald P. Norton, Washington, D. C., for appellants.

Mr. John R. Hess, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Charles T. Duncan, Corporation Counsel, Hubert B. Pair.

Principal Asst. Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee Airis.

Mr. Edmund B. Clark, Attorney, Department of Justice, with whom Messrs. S. Billingsley Hill and Thomas L. McKevitt, Attorneys, Department of Justice, were on the brief, for appellee National Capital Planning Commission, et al. Acting Asst. Atty. Gen. J. Edward Williams and Mr. Roger P. Marquis, Attorney, Department of Justice, also entered appearances for appellee National Capital Planning Commission, et al.

Before BAZELON, Chief Judge, and WRIGHT and TAMM, Circuit Judges.

PER CURIAM:

The primary question presented on appeal in this declaratory judgment and injunction action is whether the District of Columbia officials responsible for the planning and construction of highway projects in the District have been authorized by Congress to disregard the requirements of Title 7 of the D.C.Code, particularly §§ 7–108 to 7–115, in the planning and construction of four links of the proposed District of Columbia freeway system. We find that they have not and reverse the District Court judgment denying injunctive relief. In view of this disposition it is unnecessary to reach other issues raised on this appeal.

The appellants [1] have sued the Director of the Department of Highways and Traffic of the District of Columbia, the District of Columbia, the Commissioners of the District of Columbia, the members of the National Capital Planning Commission, the Federal Highway Administrator, and various other District and federal officials and agencies to enjoin the planning and construction of four highway projects known as the North Central Freeway,[2] the East Leg,[3] the Three Sisters Bridge,[4] and the Missouri Avenue Expressway.[5] Although it is not clear to what extent actual construction has begun on any of these projects, planning has gone on for some time, and land is being acquired for the North Central Freeway.

The plans for these freeway projects were initially developed by the District of Columbia Department of Highways and Traffic. The plans were then submitted to the National Capital Planning Commission, which eventually approved each of the challenged projects.[6] Shortly after being approved by the NCPC, each of the projects was approved by the Commissioners for the District of Colum-

1. The appellants are comprised of individual District of Columbia taxpayers, individual landowners affected by the challenged highways, park users affected by the highways, the Democratic Central Committee for the District of Columbia, and 16 different civic associations claiming to represent over 200,000 citizens of the District of Columbia.

2. The North Central Freeway will run generally along the right of way of the Baltimore & Ohio Railroad from the District line to Rhode Island Avenue and Tenth Street, N.E., at an estimated cost of $117,000,000, and will displace about 370 families and 90 businesses.

3. The East Leg will run from the southern terminus of the North Central Freeway through Anacostia Park to Barney Circle, S.E., at an estimated cost of $55,-000,000, and will displace about 350 families and 25 businesses.

4. The Three Sisters Bridge will span the Potomac River at or near the Three Sisters Islands at an estimated cost of $5,-800,000.

5. The Missouri Avenue Expressway will run from 16th Street, N.W., to 8th Street, N.W., along the existing path of Missouri Avenue, at an estimated cost of $4,400,-000, and will displace about 200 persons.

6. On September 15, 1966, the National Capital Planning Commission approved a portion of the North Central Freeway, a portion of the East Leg, and the Three Sisters Bridge. The remaining portions of the North Central and East Leg were approved on October 13, 1966, and February 9, 1967, respectively. The Missouri Avenue Expressway was approved on December 5, 1963.

bia.[7] Some public hearings were held while the plans were being developed.[8]

## I.

Title 7 of the District of Columbia Code is entitled "Highways, Streets, Bridges" and the relevant portions of it provide as follows: Section 7–201 authorizes the Commissioners of the District of Columbia "to open, extend, or widen any street, avenue, road, or highway to conform with the plan of the permanent system of highways * * * adopted under sections 7–108 to 7–115." [9] Section 7–108 directs the Commissioners to prepare "a plan for the extension of a permanent system of highways," [10] and section 7–122 empowers the Commissioners to change this plan "whenever in their judgment the public interests requires it." [11] The basic procedure for adopting the initial plan and for adopting changes in the plan is set out in section 7–109.[12] The District Commissioners are directed to prepare a map which shows the boundaries, dimensions, and square-footage of all planned streets and highways; to hold a public hearing for the benefit of landowners within the rights of way of the planned highways after giving notice of the hearing for 14 consecutive days; [13] to submit the plan to the National Capital Planning Commission, which is empowered to "make such alterations * * * as it shall deem advisable"; and to record the plan with the surveyor of the District of Columbia after the plan has received the written approval of the NCPC.[14]

The basic planning procedure highlighted above was enacted as part of the Act of March 2, 1893,[15] which was intended "to provide a permanent system of highways in that part of the District of Columbia lying outside the boundaries of the former cities of Georgetown and Washington." [16] By way of a rider to the 1913 District Appropriations Act, this planning procedure was adopted as the procedure for changing the street and highway plans for "any portion of

7. The District Commissioners approved a portion of the North Central Freeway, a portion of the East Leg, and the Three Sisters Bridge on September 20, 1966. The remaining portion of the North Central was approved on October 20, 1966. The record does not reveal the exact dates on which the Commissioners approved the remaining portion of the East Leg and the Missouri Avenue Expressway.

8. The minutes of the meetings of the National Capital Planning Commission show that public hearings were requested by it. The only hearing at which specific evidence was introduced indicates that the hearing was conducted by the Department of Highways and Traffic of the District of Columbia. Washington Evening Star, February 4, 1965, section A, p. 1. The evidence does not show whether or not the District Commissioners also conducted hearings.

9. Appropriation Act of March 4, 1913, 37 STAT. 950.

10. Act of March 2, 1893, 27 STAT. 532.

11. Appropriation Act of March 4, 1913, 37 STAT. 949–950.

12. Act of March 2, 1893, 27 STAT. 532–533.

13. This requirement is found in § 7–115 rather than § 7–109 and was enacted by the Act of June 28, 1898, 30 STAT. 520.

14. The most relevant substantive provision of Title 7 is that highways shall not "be less than ninety feet nor more than one hundred and sixty feet wide." Act of March 2, 1893, 27 STAT. 522, D.C.Code § 7–108 (1967).

15. 27 STAT. 532, D.C.Code §§ 7–108—112 (1967).

16. This planning power was then limited to the area outside the old cities of Georgetown and Washington because the streets of these cities had been established before one government was established for the entire District of Columbia by the Act of February 21, 1871, at 16 STAT. 419. The L'Enfant Plan established the street plan for the original District, and it was this plan which Congress wished to extend to the outer areas of the District by the Act of March 2, 1893. See § 1, 27 STAT. 532, D.C.Code § 7–108. The municipal corporation of Georgetown was permitted by § 12 of the Act of March 3, 1805. 2 STAT. 335, and § 4 of the Act of March 3, 1809, 2 STAT. 537–538, to plan streets.

the District of Columbia." [17] Another rider to the same Appropriations Act gave the Commissioners power to open and widen new streets and highways which conform to the plans so developed.[18] Thus, following the 1913 Appropriations Act, the District Commissioners were empowered to plan and open highways throughout the District, provided the plans were developed in accordance with the procedure now laid out in Title 7 and the highways built in accordance with the plans. This wide power to plan and build highways is the only general authorization the District Government has to build highways.

## II.

■ The District appellees concede that they have not complied with the procedural requirements of Title 7 but contend that these requirements are not applicable to the challenged freeway projects. To support this contention the appellees rely principally on the argument that Congress has authorized the construction of these freeway projects in disregard of the provisions of Title 7 by regularly appropriating funds to the District for highway construction with full realization that some of these funds would be used for the development of freeways. This argument is without merit.

None of the recent appropriation acts have mentioned by name the challenged projects nor have they contained any provisions relating generally to the District Commissioners' power to plan and build highways.[19] Thus, the lump-sum appropriations for street and highway construction did not expressly authorize the construction of these freeway projects. And as the appropriation of money to the District Commissioners for highway construction is entirely consistent with the provisions of Title 7, the appropriation acts cannot be seen to repeal implicitly Title 7 limitations. See Maiatico v. United States, 112 U.S.App.D.C. 295, 300–301, 302 F.2d 880, 885–886 (1962). Cf. United States v. Borden, 308 U.S. 188, 198–199, 60 S.Ct. 182, 84 L.Ed. 181 (1937); Ritholz v. March, 70 App.D.C. 283, 284–285, 105 F.2d 937, 938–939 (1939).

Furthermore, it cannot be said that the appropriation acts ratified the administrative action contrary to Title 7. Obviously, Congress cannot intend to ratify illegal action of which it is unaware. Therefore, where the ratification by appropriation argument has been accepted, courts have been careful to demonstrate factors attesting to Congress' specific knowledge of the disputed administrative action. See Brooks v. Dewar, 313 U.S. 354, 360–361, 61 S.Ct. 979, 85 L.Ed. 1399 (1941); Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 147–148, 57 S.Ct. 407, 81 L.Ed. 562 (1937); Atchison, Topeka & Santa Fe Ry. Co. v. Summerfield, 97 U.S.App. D.C. 203, 208, 229 F.2d 777, 782 (1956).[20]

In this case there is no evidence to suggest that the appropriations committee or Congress as a whole were aware of the intention of District officials to plan and construct the freeway projects in disregard of basic Title 7 procedures.[21]

17. 37 STAT. 950, D.C.Code § 7–122.

18. Id. at D.C.Code § 7–201.

19. See, e. g., § 1, 81 STAT. 438–439 (1967); § 1, 80 STAT. 1171–1172 (1966); § 1, 76 STAT. 1152–1153 (1962). Many other special projects were mentioned by name in these same statutes.

20. Another characteristic of these cases accepting the ratification by appropriation argument is that there was pre-existing statutory language which arguably authorized the disputed administrative action. In the instant case the only relevant pre-existing statutory language was directly contrary to the disputed administrative action.

21. We know of only one instance where a congressional committee commented on the District's disregard for the provisions of Title 7 and that instance supports our conclusion that Congress did not intend to give the District a special power to build freeways or to ratify action contrary to normal procedure. After receiving statements from various parties in this lawsuit, the House Committee on the District of Columbia issued a report on H.R. 11487, a bill designed to provide additional revenue for the District of Co-

General knowledge that the freeway projects were being planned or that there was a general intention to advance the freeway system as a whole is insufficient to support the ratification by appropriation argument. *See* Greene v. McElroy, 360 U.S. 474, 504–505, 79 S. Ct. 1400, 3 L.Ed.2d 1377 (1959); Ex parte Endo, 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 89 L.Ed. 243 (1944); Maun v. United States, 347 F.2d 970, 978 (9th Cir. 1965). In Ex parte Endo the Supreme Court, after recognizing the possibility of ratification by appropriation, commented:

> But the appropriation must plainly show a purpose to bestow the precise authority which is claimed. We can hardly deduce such a purpose here where a *lump appropriation was made* for the overall program of the Authority and no sums were earmarked for the single phase of the total program which is here involved. Congress may support the effort to take care of these evacuees without ratifying every phase of the program. 323 U.S. at 303 n. 24, 65 S.Ct. at 219.

Similarly, Congress may support a District of Columbia freeway program without intending to ratify actions in violation of parts of Title 7 of the District of Columbia Code. Obviously Congress, in appropriating funds, has a right to assume they will be expended according to law.

◼ We also note that because appropriation acts generally apply to a limited period of time courts have been reluctant to hold that appropriation acts affect any substantive legislation whatsoever. *See* United States v. Vulte, 233 U.S. 509, 514–515, 34 S.Ct. 664, 58 L.Ed. 1071 (1914); Cella v. United States, 208 F.2d 783, 790 (7th Cir. 1953); NLRB v. Thompson Products, 141 F.2d 794, 798–799 (9th Cir. 1944). This is especially true when the language of the appropriation act is general and contrary to specific statutes dealing with the precise area in dispute. *See* Maiatico v. United States, 112 U.S. App.D.C. 295, 300–301, 302 F.2d 880, 885–886 (1962). In sum, ratification by appropriation is not favored and will not be accepted where prior knowledge of the specific disputed action cannot be demonstrated clearly.

### III.

◼◼ The District appellees also contend that the Federal-Aid Highway acts provided authority for proceeding with the challenged freeway projects without regard for Title 7 because the acts permit the District to participate for federal aid. This contention also is without merit. |The primary purpose of the Federal-Aid Highway acts is to stimulate and accelerate the construction of the federal-aid highway systems by offering federal aid to state and local bodies who construct these approved highways. *See* 23 U.S.C. § 101(b) (Supp. II 1965–66).

---

lumbia, wherein the majority stated as follows:

> No attempt is made to determine the relative merits of the differing view [concerning the District's authority to proceed with the freeway projects]. Rather, your committee considers this bill as a revenue measure and not an authorization for any project included in estimates for capital outlay. * * * No presumption is to be drawn that the approval of the borrowing authority means that * * * present authority or limitations applying to the planning and construction of highways is changed in any way. [*Hearings Before Special Subcommittee on Taxation of the House Committee on the District of*

*Columbia*, 89th Cong., 2d Sess., Supp. 2, at 102 (1966).]

In this same report the minority stated that it objected to providing the District with additional revenue for freeway construction because District highway planners were abusing their authority to the ruination of "the Nation's Capital * * * as a place to inhabit and enjoy." *Hearings, supra*, at 111. The minority further stated that "[t]he only discretionary authority given the Commissioners to lay out new highways in the District of Columbia is that contained in the act of 1893 * * * authorizing a plan for the permanent system of highways in the District of Columbia." *Hearings, supra,* at 112.

No provision of the Federal-Aid Highway legislation authorizes the District, state, or federal agencies to plan and build highways. | The federal appellees, disagreeing with the District appellees, have stated that the federal government has always urged that state and local authorities must comply with their own statutes.

■■ State and federal courts considering the applicability of state laws to federal-aid highways have agreed that state laws regulating the planning and building of highways were not set aside by the Federal-Aid Highway acts. *See* Eden Memorial Park Association v. United States, 300 F.2d 432, 438–439 (9th Cir. 1962); Futch v. Greer, 353 S.W.2d 896, 899–900 (Tex.Civ.App.1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963); *cf.* Hinrichs v. Iowa State Highway Commission, 152 N.W.2d 248, 253–255 (Iowa 1967). And contrary to the allegations of District appellees, the Federal-Aid Highway legislation is not inconsistent with § 7–108 of the D.C.Code limiting highway width to 160 feet or § 7–201 directing the District Government to assess land owners abutting newly constructed highways for additional benefits.[22] The Federal-Aid Highway legislation does not specify a minimum width for highways qualifying for federal aid (highways 160 feet wide and under could qualify) and (does not concern itself with the manner in which state and District governments raise the revenue for their share of the costs of the federal-aid highways.) Thus, these D.C.Code provisions have not been im-

pliedly repealed by the subsequent Federal-Aid Highway acts. *See* MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163 (1944); United States v. Borden, 308 U.S. 188, 198–199, 60 S.Ct. 182, 84 L.Ed. 181 (1939); Maiatico v. United States, 112 U.S.App.D.C. 295, 300–301, 302 F.2d 880, 885–886 (1962). Also, past history indicates that if Congress intended to set aside certain provisions of Title 7, such as the width limitation, it would do so explicitly. *See* Redevelopment Act of 1945, 60 STAT. 802 (1946), D.C.Code § 5–718(a) (1967). Therefore, we conclude that the Federal-Aid Highway legislation does not modify Title 7.

### IV.

■ Finally, District appellees argue that the Act of 1893 was not intended to regulate "wide Interstate Expressways." To the contrary, we believe that the procedures set out therein are even more important for regulating the "wide Interstate Expressways," for these projects generally affect more people and larger areas of the District than any other type of street and, therefore, are potentially more destructive of aesthetic values and fundamental property rights.

From the very beginning the aesthetic and functional advantages of planning have been afforded the Nation's Capital. The original federal city was conceived as a planned city and developed according to the L'Enfant Plan.[23] This basic plan has been extended throughout the District of Columbia[24] and has been endorsed many times.[25] The continued im-

---

22. The Federal-Aid Highway legislation appears to be entirely consistent with the provisions of Title 7. Section 116(c) of the Federal-Aid Highway Act of 1956, 70 STAT. 385, 23 U.S.C. § 128(a) (1964 ed.), endorses the important public hearing requirement by requiring local highway departments seeking federal aid to certify that public hearings have been held.

23. *See generally* C. GREEN, WASHINGTON: VILLAGE AND CAPITAL 1800–1887 (1962).

24. *See* Public Buildings Act of 1959, 73 STAT. 481 (1959), as amended, 40 U.S.C. § 607(a) (1964 ed.) (public buildings

within the District of Columbia to be constructed in harmony with the L'Enfant Plan); Act of March 2, 1893, 27 STAT. 532, D.C.Code § 7–108 (1967) (street plan for District to conform to the L'Enfant street plan).

25. *Ibid. See also* the frequent endorsement of the L'Enfant Plan by the National Capital Planning Commission in its recent publication entitled "The Proposed Comprehensive Plan for the National Capital" (Feb.1967). At page 10 of the report, it is said that the "L'Enfant Plan continues to provide the strong

portance of planning to Washington is evidenced by the Redevelopment Act of 1945,[26] pertaining to the renewal of Southwest Washington, and the National Capital Planning Act of 1952,[27] providing for planning throughout the entire metropolitan region. To allow the District government to build large expressways without regard for the District highway plan, which was initiated for the express purpose of preserving the L'Enfant street plan, would be inconsistent with history, a strong tradition, and express statutory language.

It should also be recognized that the procedures outlined in Title 7 are designed to protect property rights by insuring that the highway plans are evolved democratically rather than arbitrarily.[28] The public hearing required by § 7–115 offers the public an opportunity to participate in the administrative decision and forces the administrators to spell out the reasons for their decision—a check and balance basic to

our entire system of government.[29] The basic procedure established by § 7–109 and § 7–115 whereby the District Commissioners are directed to hold a public hearing before approving a highway plan and the District Commissioners are to approve the plan before submitting it to the National Capital Planning Commission is also very significant. Though the District Commissioners are appointed rather than elected, their primary interest is the District of Columbia,[30] and, therefore, they are likely to be more responsive to a group of District residents than is the National Capital Planning Commission whose duties are federal in nature and whose jurisdiction extends throughout the metropolitan area.[31] That is, it is probable that a group of District of Columbia citizens would have more leverage on the final decision if their opinions were presented to the District Commissioners, a local interest group, before the plans were officially approved by the Commission-

framework on which the city is organized to meet the needs of a growing resident population."

26. 60 STAT. 790 (1946), D.C.Code §§ 5–701—719 (1967).

27. 66 STAT. 781 (1952), D.C.Code §§ 1–1001—1013 (1967).

28. See generally Reich, The Law of the Planned Society, 75 YALE L.J. 1227, 1243–1247, 1257–1261 (1966).

29. This type of check and balance is of increasing importance because the more complex our society becomes the greater the quantity of decisions delegated to agencies. As more decisions are delegated, our elected officials are less able to keep watch over the many agency decisions, and decision-makers are less responsive to the desires of the citizenry. See Reich, supra note 28, at 1243–1244. Congress has recognized the importance of public hearings to various administrative decisions. See, e. g., United States Housing Act of 1949, 63 STAT. 416, 42 U.S.C. § 1455(d) (1964 ed.) (public hearing before land may be acquired for urban renewal); Federal-Aid Highway Act of 1956, 70 STAT. 385, 23 U.S.C. § 128(a) (public hearing for federal-aid highway route selection).

It should be noted that this case only raises the question of whether hearings must be held as required by § 7–115 of the D.C.Code and does not present the more difficult question of whether particular hearings fulfilled statutory and due process standards. Cf. Nashville I–40 Steering Committee v. Ellington, 387 F.2d 179 (6th Cir. 1967), cert. denied, 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982 (1968); Scenic Hudson Preservation Conference v. F.P.C., 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); Road Review League v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967).

30. See Organic Act of 1878, 20 STAT. 102, D.C.Code §§ 1–101—103 (1967).

31. See National Capital Planning Act of 1952, 66 STAT. 781, D.C.Code § 1–1001 (1967). See also the message of President Johnson to Congress on the transmittal of District Reorganization Plan No. 5 of 1966, Title 1—Administration, Appendix, p. 105–106, where the President states that "the basic responsibilities of the National Capital Planning Commission * * * [are] to represent the Federal interest in the planning and development of the region."

ers or the National Capital Planning Commission. It is then possible that the District Commissioners might endorse their views and recommend them to the National Capital Planning Commission, thus giving added significance to the citizens' opinions.[32] Finally, the provision in § 7–109 requiring District Commissioners to record immediately with the surveyor the plan finally approved by the District Commissioners and the National Capital Planning Commission serves final notice to the public, thereby facilitating public cooperation and planning.

In sum, we believe that the only power the District government has to build roads is that granted by the provisions of Title 7, and we believe that this power extends to all types of highways built within the District. Nothing we have said is in derogation of this vast power, and nothing we have said pertains to the merits of the challenged projects. Rather, we are reversing the District Court decision because, without authorization from Congress, the District appellees have disregarded the relevant statutes in planning and constructing the four freeway projects in suit here.

Reversed and remanded.

PER CURIAM:

The court's attention has been called to the motion of the District of Columbia appellees for clarification and/or modification. Nothing we have said in the opinion this day entered is intended to prevent the District of Columbia from completing settlement on those contracts of purchase, already made, where the owners, after being advised of this court's action in this case, indicate a willingness to do so, provided that so doing will not violate Title 7 of the D.C. Code.

We are also advised by Corporation Counsel that the Taylor Street Bridge "serves local traffic needs and must be rebuilt regardless of whether the North Central Freeway is constructed." Nothing we have said in our opinion dated today is intended to prevent the construction of the Taylor Street Bridge unless that construction will violate Title 7 of the D.C.Code.

Nothing we have said in our opinion this day entered shall be construed as either prohibiting or authorizing the District of Columbia appellees to complete settlement on those contracts of purchase, already made, where the homeowners, after being advised of this Court's action, indicate a willingness to do so.

32. Another important advantage to following correct statutory procedure is that citizens are then on notice as to the actual decision-making body and may focus their protests and requests accordingly.