NATIONAL WILDLIFE FEDERATION
et al., Plaintiffs,

v.

Cecil D. ANDRUS, Secretary, Department
of Interior, et al., Defendants.

Civ. A. No. 76–2266.

United States District Court,
District of Columbia.

June 21, 1977.

Patrick A. Parenteau, Nat. Wildlife Federation, Washington, D.C., for plaintiffs.

Gary B. Randall, United States Dept. of Justice, Washington, D.C., for defendants.

Robert S. Catz, Washington, D. C., for Trout Unlimited and New Mexico Council of Trout Unlimited, plaintiffs-intervenors.

Al Pitts, Santa Fe, N. M., for New Mexico Dept. of Game and Fish, plaintiff-intervenor.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This action for declaratory and injunctive relief challenges the legality of a proposed 23 megawatt powerplant now under construction at the already existing Navajo Dam on the San Juan River in New Mexico. The original complaint, filed December 10, 1976, by the National Wildlife Federation and the New Mexico Wildlife Federation,[1] alleged that defendants had violated the National Environmental Policy Act of 1969 [NEPA], 42 U.S.C. § 4331 et seq., and the Fish and Wildlife Coordination Act [FWCA], 16 U.S.C. § 661 et seq. Plaintiffs sought to enjoin further construction of the powerplant at the present site. On February 9, 1977, plaintiffs filed an amended complaint which contained the additional allegation, based on 43 U.S.C. § 615ii, that defendants exceeded their statutory authority in constructing a 23 megawatt power-

plant at the Navajo Dam. The parties stipulated as to the basic facts and cross-moved for summary judgment.

## I. Facts

The San Juan River is the second largest tributary of the upper Colorado River. The river and its banks are home to a wide variety of fish, aquatic mammals and migratory waterfowl. Between 1958 and 1963, a dam was constructed which spans a winding canyon of the river approximately 39 miles east of Farmington, New Mexico. The facility, known as the Navajo Dam and Reservoir, was authorized by Congress in the Colorado River Storage Project Act of April 11, 1956. 43 U.S.C. § 620. As originally authorized, the facility was specifically limited by Congress to "dam and reservoir only." Id. No powerplant was authorized, and in fact one of the specific objectives of the Project was to "mitigate losses of, and improve conditions for, the propagation of fish and wildlife." Id. § 620g.

Prior to completion of the Navajo Dam in 1963, the San Juan River provided a natural warm water fishery. The dam created instead a cold water fishery by virtue of cold, clean, stable releases of water from the reservoir. In these cold waters the New Mexico Department of Game and Fish established and maintained a quality trout fishery which is now recognized as one of the finest resources of its kind in the southwestern United States. In addition to fish, the river supports aquatic mammals such as beaver and muskrat and provides a nesting area for certain waterfowl. The parties agree, and therefore there is no factual dispute, that the flow of the San Juan River below Navajo Dam is not presently subject to systematic rapid daily fluctuations and that both the fish and the other wildlife might be adversely affected should

---

1. The original plaintiffs have now been joined by several intervenors. Trout Unlimited and the New Mexico Council of Trout Unlimited moved to intervene and were given leave to do so March 1, 1977. Like the two original plaintiffs, these intervenors are conservation groups whose members regularly use and enjoy the natural resources of the San Juan River. On May 9, 1977, the right to intervene was granted to the New Mexico State Game Commission and the New Mexico Department of Game and Fish. These departments of the New Mexico state government have an obvious interest in the subject matter of this litigation.

there occur rapid daily fluctuations in water volume and rate of flow.[2]

The powerplant which is the subject of this litigation is part of the Navajo Indian Irrigation Project [NIIP].[3] This project was authorized June 13, 1962, 43 U.S.C. § 615ii, as an element of the Colorado River Storage Project. NIIP was designed principally to irrigate 110,630 acres owned by the Navajos in northwestern New Mexico. The 1962 NIIP legislation did not envision the powerplant which is at issue here. Instead the authorized powerplant was to have been located on the main irrigation canal near Chaco Wash, a tributary of the San Juan River. The originally proposed powerplant was to have had a maximum capacity of 15 megawatts and was to be used solely to provide electrical energy for NIIP's irrigation pumps.

Subsequent to this original authorization of NIIP in 1962, the project was reevaluated by the Bureaus of Reclamation and of Indian Affairs. The purpose of this reevaluation, which culminated in a Reevaluation Report dated July 1966,[4] was to maximize the benefit of the Navajos from the irrigation project. Because the reevaluation found that certain of the lands designated for NIIP were not suitable for sustained irrigation, an equivalent area of land elsewhere was substituted. Legislation was required in order to obtain the necessary additional land. Accordingly Congress amended the original 1962 authorization by an Act of September 25, 1970. 42 U.S.C. §§ 615ii–615yy. The substitution of lands in NIIP which was occasioned by this reevaluation and subsequent legislation rendered the proposed powerplant at Chaco Wash infeasible. A necessity thus arose to find an alternative power source for the irrigation project. The 1966 report did not specifically recommend a 23 megawatt powerplant at Navajo Dam, but the possibility of such a facility as an alternate power source was discussed in the report. In 1973 and 1974, defendants prepared an administrative re-port entitled "The All-Sprinkler Irrigation System Report," which proposed construction of a 23 megawatt powerplant at Navajo Dam.

Between 1974 and 1976, defendants purchased $3.6 million worth of generating equipment for the proposed 23 megawatt powerplant at Navajo Dam. Pursuant to the provisions of NEPA, defendants on June 4, 1976, released for public review and comment a draft environmental statement [DES]. In this document, defendants proposed construction for the 23 megawatt facility and operation of the powerplant year-round to serve the sprinkler irrigation system of NIIP and other non-NIIP power demands. In response to the DES, several of the plaintiffs submitted critical comments regarding the unexplored impact of the powerplant on the downstream fishery. On October 12, 1976, defendants issued a final environmental statement [FES] in which the plan for a 23 megawatt powerplant at Navajo Dam remained essentially the same as in the DES.

Shortly thereafter certain of the plaintiffs submitted further comments to the effect that the FES remained inadequate. Certain plaintiffs also met the representatives of defendants to discuss the potential adverse effects upon downstream fish and wildlife resources. As a result of the meeting, defendants agreed to initiate studies to determine the downstream effects of various flow patterns from the proposed powerplant. Defendants, however, refused to suspend construction of the powerplant pending completion of these studies. Plaintiffs also suggested several alternatives to the powerplant, including building a smaller plant, not building the plant at all, and delaying its construction until studies were completed. On November 29, 1976, defendants made a final decision to construct the proposed 23 megawatt facility at Navajo Dam and awarded a construction contract. Defendants considered but rejected the al-

---

**2.** *See* plaintiffs' and defendants' "Statement of Material Facts" ¶¶ 6–9.

**3.** Plaintiffs do not challenge the legality of any aspect of NIIP other than the Navajo Dam powerplant. In fact, all plaintiffs have announced themselves to be in full support of the irrigation program as originally conceived.

**4.** This report is Exhibit 3 in the record.

ternatives suggested by plaintiffs. At least in part, this decision was based on the previous expenditure of $3.6 million for equipment to be used in the powerplant.[5] At present approximately 10% of the work—mostly in site preparation—has been completed.

## II. Statutory Authority

■ Before reaching the issue of defendants' compliance with NEPA and FWCA, the court must consider whether defendants have acted consistently with their statutory authority in planning and constructing the powerplant. Plaintiffs contend that Congress has never deviated from its original intent, as expressed in 43 U.S.C. § 620, that the Navajo Dam should feature "dam and reservoir only." It is clear from that statute that, at least at the time of its passage in 1956, Congress intended to preclude the use of Navajo Dam for power purposes, especially in light of the fact that powerplants were specifically approved for three other dams mentioned in the statute.[6]

Plaintiffs further argue that the 1962 legislation which authorized NIIP is consistent with that original intention of Congress. Although Navajo Dam was almost completed at that time, Congress looked elsewhere for the power source necessary for the irrigation project. Congress authorized a 15 megawatt powerplant on the main irrigation canal, a fact which plaintiffs emphasize as suggestive of continuing congressional opposition to a Navajo Dam powerplant. In addition to limiting the authorized NIIP powerplant to 15 megawatts, Congress specifically provided that "[t]he plant would operate only during the irrigation season and for the sole purpose of providing power to the pumping plant." House Doc. 424, 86th Cong., 2d Sess. 277 (1960).[7]

The crucial legislation with respect to defendants' statutory authority is the Act of September 25, 1970, which amended the authorizing legislation of NIIP. Though the Act makes certain specific authorizations regarding NIIP and its relation to the Colorado River Storage Project, there is no mention of a proposed powerplant at Navajo Dam. Defendants point out, however, that the report of the Senate Committee on Interior and Insular Affairs, the committee which reviewed the Senate version of the 1970 amendment, specifically states that the project "includes a powerplant at Navajo Dam." S.Rep.No. 363, 91st Cong., 1st Sess. 2 (1969). In addition, the 1966 Reevaluation Report, which mentions a powerplant at Navajo Dam without specifically recommending it or describing it in detail, was made part of the files of the House subcommittee which considered the legislation in the House.[8] *Hearings on H.R. 13001 Before the Subcomm. on Irrigation and Reclamation of the House Comm. on Interior and Insular Affairs*, 91st Cong., 2d Sess. 41 (1970). Defendants apparently believe that Congress incorporated into the 1970 legislation the suggestion of a Navajo Dam powerplant found in the 1966 Reevaluation Report, but in fact the report contained nothing specific or detailed enough to be considered a distinct recommendation. It was not until the 1973–74 All Sprinkler Irrigation System Report that the powerplant was actually proposed, and that report has never been submitted to Congress.

■ Defendants contend that their actions in proposing and constructing the powerplant at Navajo Dam are not fundamentally inconsistent with the original authorization in 1956. In support of this contention, they refer to the fact that the dam

---

5. *See* plaintiffs' and defendants' "Statement of Material Facts" ¶ 27.

6. This reading of Congress' intent is fully supported by the legislative history. *See* 1956 U.S. Code Cong. & Admin. News pp. 2346, 2352.

7. This House Document is Exhibit 2 in the record.

8. Defendants also note that the House committee report on the amendment mentioned that "the physical plan has been adapted to accommodate the modification of the project." See H.Rep. No. 1333, 91st Cong., 1st Sess. 2 (1970). This statement, however, says little or nothing about Congress' intentions with respect to the specific facility here at issue.

was designed and constructed to allow later installation of a powerplant. This fact suggests nothing, however, about whether Congress ever authorized such design and construction, and that is the issue before this court. Clearly the appropriate officials have some discretion to modify aspects of the various programs within the Colorado River Storage Project.[9] But such modifications must occur within the statutory authority granted by Congress. Where Congress has been specific in its authorization or its lack thereof, the discretion of the officials is accordingly diminished. Here Congress expressly refused to authorize the very work which defendants have undertaken. Defendants' discretion does not extend to providing an authorization where Congress saw fit to withhold it.

■ Defendants argue that their position is supported by the appropriation of funds for the powerplant in successive Congresses between 1974 and 1977. They must acknowledge, however, the "general principle that Congress cannot and does not legislate through the appropriations process." *Atchison, Topeka and Santa Fe Railway Co. v. Callaway*, 382 F.Supp. 610, 620 (D.D.C. 1974). Furthermore, "ratification by appropriation is not favored and will not be accepted where prior knowledge of the specific disputed action cannot be demonstrated clearly." *D.C. Federation of Civic Ass'ns v. Airis*, 129 U.S.App.D.C. 125, 129, 391 F.2d 478, 482 (1968).

Here defendants attempt to except themselves from the usual rule against legislation by appropriation by showing that Congress did in fact have specific knowledge of the powerplant at Navajo Dam. The only indications in the record that Congress specifically knew of the powerplant are instances in which it is included in proposals for work pursuant to NIIP. There appear to be no references to the powerplant in

discussions at hearings, and there is no specific mention of the powerplant in the appropriations bills themselves. In addition, references to the powerplant, buried as they are amid many other proposals related to NIIP, hardly seem sufficient to alert Congress to the possibility that it is being asked to appropriate funds for an unauthorized project. The mere fact that the powerplant was mentioned in certain proposals does not by itself indicate congressional awareness, especially since "Congress, in appropriating funds, has a right to assume they will be expended according to the law." *Id.*

Defendants rely on cases holding that it is up to Congress to determine whether an agency is proceeding in accordance with congressional authorization and, if it is not, what to do about it. *See, e. g., Environmental Defense Fund v. Corps of Engineers*, 325 F.Supp. 749, 754–55 (E.D.Ark. 1971), *aff'd on other grounds*, 470 F.2d 289 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). That does not appear to be the law in this circuit. *See D.C. Federation of Civic Ass'ns v. Airis, supra.* The cases cited by defendants, moreover, have involved situations where there was at least arguably a prior authorization. Here, not only is there no prior authorization of the powerplant, but there is substantial evidence in the authorizing statute to the effect that Congress expressly disapproved such a powerplant at Navajo Dam. Where, as here, "the only relevant pre-existing statutory language was directly contrary to the disputed administrative action," the court of appeals for the District of Columbia Circuit has held that ratification by appropriation is particularly unlikely. *Id.* at 481 n. 20.

### III. *Compliance with NEPA*

■ Plaintiffs alternatively challenge defendants' actions in proposing and con-

---

**9.** 43 U.S.C. § 615ii states that the project is "substantially" the same as that described in a 1957 proposed coordinated report. In that report, it is recommended that authority be sought from Congress for the Secretary of the Interior to make "such modification of, omissions from, or additions to the works as [he]

may find proper." *See* Exhibit 2, p. XXI. Perhaps significantly, Congress did not give the Secretary such a broad authority but instead specified various elements of the project which the Secretary was authorized to implement. *See* 43 U.S.C. §§ 615ii–615yy.

structing the powerplant under NEPA. In § 101(a) of NEPA, 42 U.S.C. § 4331, Congress stated that it was the continuing policy of the federal government "to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." To that end, Congress prescribed in § 102, 42 U.S.C. § 4332, elaborate procedures to be followed "to the fullest extent possible" prior to taking any major federal action "significantly affecting the quality of the human environment." The central procedural requirement is a "detailed statement" concerning, *inter alia*, "the environmental impact of the proposed action" as well as "any adverse environmental effects which cannot be avoided should the proposal be implemented." *Id.* § 4332(2)(C). The statement must consider "alternatives to the proposed action," and prior to making the statement the agency must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.*

These procedural requirements were considered at length by the court of appeals in the case of *Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). The opinion of the court there made clear that the agency's procedural duties under this section "are not inherently flexible." *Id.* at 1115. As Judge Wright noted, "if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse." *Id.* The statute itself provides that environmental matters be considered "to the fullest extent possible." According to the *Calvert Cliffs* court, this command "sets a high standard for the

agencies, a standard which must be rigorously enforced by the reviewing courts." *Id.* at 1114. Plaintiffs contend that defendants have failed to meet that high standard in several important regards.

### A. Sufficiency of Detail in the FES

First, plaintiffs argue that defendants' FES is totally lacking in the specificity which is required by NEPA and the cases interpreting it. While plaintiffs' assertion that the FES has no detail whatsoever is perhaps a bit overstated, it is true that the FES offers little in the way of detail concerning the specific problem with the powerplant which was raised by plaintiffs and other interested parties prior to defendants' final decision. That problem is the effect which varying flow patterns from the powerplant might have on aquatic and other wildlife below Navajo Dam.

Defendants discuss briefly the powerplant itself and the fishery below the dam.[10] But there is scant evidence that there has been a hard look at the effects of the operation of the powerplant, though defendants do admit that its operation will have some adverse implications on the fish and wildlife downstream. The FES states:

> The projected operation of Navajo Dam powerplant would have an effect on wildfowl production (nesting) areas along the San Juan River below the dam. Daily water fluctuations could result in nesting failures due to inundation of the eggs.
>
> \* \* \* \* \* \*
>
> Further study may be desired in order to find an optimum flow schedule that will still preserve the integrity of the Navajo powerplant for use by the NIIP without causing adverse impacts on the fish and wildlife resources below Navajo Dam during both the winter and the irrigation season.[11]

With respect to the impact upon the trout fishery, the FES takes a similar position:

> Hourly and daily fluctuation in flow rates have not been well defined and could

---

**10.** FES I–5, I–6, II–47, II–49, and II–51.

**11.** FES III–23.

have an impact on aquatic invertebrate production in the San Juan River. Studies of the hourly and daily fluctuation in the flows below Navajo Dam have not been completed. When completed, these studies are expected to provide baseline data necessary to provide an optimum fishery and wildlife management plan.

\* \* \* \* \* \*

Continuing studies among the Bureau of Reclamation, the State Game & Fish Department, U.S. Fish and Wildlife Service, the Navajo Tribe and the Bureau of Indian Affairs will result in an operating plan to optimize the values potentially available from Navajo Reservoir and especially fish and wildlife values.[12]

As these excerpts from the FES indicate, defendants concede that there will be an effect on the fish and wildlife below the dam, but they give no details as to what that effect may be. The many references to future studies which will determine later the environmental impact of the powerplant reflect the fact that defendants have yet to make the sort of probing examination which is required by NEPA. Their consistent attitude in the FES is that they may continue with the project while detailed studies of the effects of the project are generated, despite the fact that NEPA clearly envisions that such studies should precede major federal actions.[13]

This piecemeal approach to the FES advocated by defendants has been rejected by the courts on several occasions. In language relevant to this case, the court in *Calvert Cliffs* observed that "[o]nce a facili-

ty has been completely constructed, the economic cost of any alteration may be very great." 449 F.2d at 1128. And in *Scientists' Institute for Public Information v. Atomic Energy Commission*, 156 U.S.App. D.C. 395, 409–10, 481 F.2d 1079, 1093–94 (1973), the court added:

[B]y the time commercial feasibility of the technology is conclusively demonstrated, and the effects of application of the technology certain, the purposes of NEPA will already have been thwarted. Substantial investments will have been made in development of the technology and options will have been precluded without consideration of environmental factors. Any statement prepared at such a late date will no doubt be thorough, detailed and accurate, but it will be of little help in insuring that decisions reflect environmental concerns.

Most recently, defendants' piecemeal approach was disapproved in *Natural Resources Defense Council v. Nuclear Regulatory Commission*, 178 U.S.App.D.C. 336, 343, 547 F.2d 633, 640 (1976), where the court found that one of the purposes of NEPA "was to break the cycle of such incremental decision-making."

Plaintiffs also contend that the FES is deficient because it fails adequately to address the comments of various interested parties, including several governmental agencies which were critical of the draft statement. Of course, defendants have an obligation under NEPA to "consult with and obtain the comments of any Federal agency which has jurisdiction by law or

---

12. FES III–35.

13. Defendants cite *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 91 (2d Cir. 1975), for the proposition that NEPA does not preclude continuing a proposed action while subsequent detailed studies are generated. That case merely held, however, that an inadequate environmental impact statement could be supplemented to make it acceptable. Here defendants argue another, very different notion, *i. e.,* that their FES need not be supplemented by these studies until some unspecified future time when the studies are completed. Significantly, the court in the *Callaway* case also noted:

Although an EIS may be supplemented, the critical agency decision must, of course, be made after the supplement has been circulated, considered and discussed in the light of the alternatives, not before. Otherwise, the process becomes a useless ritual, defeating the purpose of NEPA, and rather making a mockery of it.

*Id.* at 92. Here the crucial decision was the one to build the powerplant in the first place, not, as defendants seem to argue, the one which will determine the manner in which the powerplant will be operated. Clearly that crucial decision was made before the FES could be supplemented by additional studies.

special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(2)(C). Implicit in this obligation is a further requirement that defendants consider and respond to such comments from another agency. Here the United States Fish and Wildlife Service found the draft statement lacking in its discussion of impact on the aquatic environment,[14] but defendants' only response was that "[i]nformation on the downstream aquatic and wetland areas for various proposed reservoir releases is not available at this time."[15] In response to similar comments from the Bureau of Reclamation concerning the inadequate discussion of impact on the trout fishery,[16] defendants refer to the fishery as a "newly created resource," one of several "interim conditions that will be reduced to a level somewhere between original and present levels when the project is completed."[17] As in other segments of the FES, defendants here seem to believe that mere admission of some impact is sufficient without supplying the detail which is required by NEPA and which is necessary for informed decision-making.

■ In the absence of specifics and details with respect to the impact upon downstream fish and wildlife, defendants cannot have engaged in the "finely tuned" balancing analysis which is mandated by NEPA. *See Calvert Cliffs, supra,* 449 F.2d at 1113. A weighing of economic benefits against environmental costs is impossible where there is only speculation and the promise of future details concerning the impact upon the environment. Nowhere do defendants assert that it would have been impossible to determine such variables as flow patterns prior to embarking upon this project. Instead they take what the court views as an unreasonable position to the effect that it is the operation of the powerplant and not its construction which poses an environmental hazard. Surely one of the purposes of NEPA was to provide planning adequate to avoid situations such as this one, where an agency expends millions of dollars in constructing a facility which perhaps should never be operated because of the environmental costs which accompany it.

## B. *Consideration of Alternatives*

NEPA specifically requires that the environmental impact statement contain a "detailed statement" concerning "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). Furthermore, federal agencies are under an obligation to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E). Plaintiffs allege that defendants' FES falls far short of meeting these standards.

In the section of the FES entitled "Alternatives," defendants considered two alternatives to the powerplant as it is now being constructed:[18] (1) obtaining the necessary power from alternative power sources already extant in the area; (2) using gas-powered engines for pumping requirements. The first alternative was dismissed with this comment:

> The effect of this alternative on the Navajo Indian Nation would be an increase in annual operation and maintenance costs of more than $2 million per year. In addition, hydrogeneration does not create pollutants, nor consume any of our

---

**14.** FES IX–14, IX–20.

**15.** FES IX–20.

**16.** FES IX–8.

**17.** Defendants seem to suggest that the natural resources now flourishing below Navajo Dam are somehow entitled to less protection from NEPA because they are the result of the construction of the dam. There is no merit to such a notion. The mere fact that the trout fishery

and other environmental aspects of the area owe their thriving present existence to past projects does not mean that future projects may ignore these relatively new natural assets as if they were not there. They have become as much a part of the "human environment" which NEPA was designed to protect as any other natural resource.

**18.** FES VIII–3.

natural resources. It would have to be replaced with coal-fired or nuclear generating plants, and the resulting overall environmental impact would be greater. Concerning the second alternative, the FES concluded that "[t]his is not a viable alternative since natural gas is in short supply and subject to curtailment for such use." These comments represent the total treatment by the FES of possible alternatives, a requirement which has been described as "the linchpin of the entire impact statement." *Monroe County Conservation Council v. Volpe,* 472 F.2d 693, 697–98 (2d Cir. 1972). This section of the FES appears lacking in the detail which is clearly required by the statute itself and in the "rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might . . . avoid some or all of the adverse environmental effects." *See* Council on Environmental Quality Guidelines, 40 C.F.R. § 1500.8(a)(4) (1976).

■ More importantly, however, there were several alternatives before defendants which were not treated at all in the FES. These undiscussed alternatives include the following: (1) building a smaller powerplant such as the 15 megawatt plant authorized by Congress; (2) obtaining power from the uncommitted reserves stored in the Colorado River Storage Project system; and (3) delaying construction pending completion of environmental studies. Admittedly there is a "rule of reason" implicit in the requirement that alternatives be discussed in the FES. *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 12, 458 F.2d 827, 834 (1972). These alternatives, however, are not unreasonable ones, and they should have been considered and discussed in the FES. Defendants had a particular obligation to deal with the first alternative mentioned above in light of the fact that Congress expressly limited its authorization of a powerplant to 15 megawatts, and defendants never received explicit authorization to create a much larger

power source instead. The third alternative, moreover, was deserving of special attention since that is the course of action which would be most consistent with the letter and spirit of NEPA.

In their papers filed with the court in this case, defendants have offered some rationalizations for refusing these alternatives. The proper place for such rationalizations was the FES. NEPA requires that the reasons for accepting certain alternatives and rejecting others be set forth in a detailed environmental impact statement so that the public and other federal agencies will be better informed as to the environmental costs of decisions. Even if defendants in fact gave careful consideration to the alternatives—and it is not at all clear from the record that they did—an important purpose of NEPA is not served if the reasons underlying defendants' decision remain undisclosed in the FES. The court of appeals for this circuit has recently reaffirmed that an agency "must explain the basis for each conclusion that further consideration of a suggested alternative is unwarranted." *Aeschliman v. Nuclear Regulatory Commission,* 178 U.S.App.D.C. 325, 547 F.2d 622, 628 (1976).

### C. Pre-FES Activity

■ It is undisputed that, prior to completion of the FES, defendants purchased $3.6 million of equipment for the proposed powerplant. Nor is it disputed that the rejection of several proposed alternatives to the powerplant was based at least in part on that previous expenditure. Defendants virtually admit that their pre-FES purchase of equipment was a violation of NEPA, but they contend that any violation has been cured by the FES. This contention may be accurate with respect to NEPA's requirement of a detailed statement on "the environmental impact of the proposed action." *See* 42 U.S.C. § 4332(2)(C)(i). But, since the rejection of alternatives was based on an illegal action, defendants should be required to reconsider the alternatives, pursuant to

§ 4332(2)(C)(iii), in light of that illegality. If agencies are allowed to undertake major federal actions without complying with NEPA and then to compound their error by basing later decisions on their previous illegal actions, then NEPA's protections will be rendered worthless.

## IV. Compliance with FWCA

■ Pursuant to FWCA, 16 U.S.C. § 662(b), the Secretary of the Interior has a responsibility to report and make recommendations concerning modification of any stream or other body of water. This report serves "the purpose of determining means and measures that should be adopted to prevent the loss of or damage to such wildlife resources." The statute requires that the report "be made an integral part of any report prepared or submitted by any agency of the Federal Government responsible for engineering surveys and construction of such projects when such reports are presented to the Congress." While an obvious purpose of the statute is to force agencies to consider the environmental consequences of their projects, another purpose appears to be to inform the Congress of those consequences to enable it to consider conservation measures. The legislative history underscores this purpose:

> Unquestionably, the bill, if enacted, would result in the Congress having better information on the effects of water projects on fish and wildlife resources while considering project-authorizing legislation. It will then, of course, be for the Congress to decide what conservation measures should be incorporated in any project.

S.Rep.No. 1981, 85th Cong., 2d Sess. 7 (1958).

Plaintiffs contend that defendants have violated FWCA by failing to submit any such report to Congress concerning the powerplant at Navajo Dam and its impact upon the downstream game and fish. Defendants apparently concede that they have not submitted the report, but they argue that their good faith attempts to comply with NEPA are sufficient to meet the requirements of FWCA as well. The court in *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 355–56 (8th Cir. 1972), did so hold, but only on the assumption that a good faith effort to comply with NEPA would automatically consider all the factors required by FWCA. Here defendants have not complied with NEPA. More to the point, however, plaintiffs have identified a FWCA policy, that of informing Congress of environmental effects, which may not be duplicated by NEPA. In such circumstances, strict compliance with FWCA should be required. This is especially true in view of the doubtful authorization by Congress of the powerplant project in the first place. If defendants were compelled to report to Congress on the project and its environmental impact, then Congress would have the opportunity clearly to approve or disapprove the powerplant as currently planned.

## V. Injunctive Relief

As the above discussion indicates, the court holds in this action that the 23 megawatt powerplant at Navajo Dam is being constructed without proper congressional authorization. The court also alternatively holds that construction of the powerplant is in violation of NEPA and FWCA. It must now be determined whether the circumstances of this case warrant imposition of an injunction upon further construction of the powerplant.

■ There is some authority for the proposition that, where a federal statute has been violated, the court will not inquire into the traditional requirements for equitable relief but will instead grant an injunction against further violation of the statute without regard to those requirements. *Sierra Club v. Coleman,* 405 F.Supp. 53, 54 (D.D.C.1975); *Atchison, Topeka and Santa Fe Railway Co. v. Callaway, supra,* 382 F.Supp. at 623. *See United States v. City and County of San Francisco,* 310 U.S. 16,

**1256**

60 S.Ct. 749, 84 L.Ed. 1050 (1940). At the very least, a clear and substantial violation of a statute will lessen the need to balance other factors in determining the propriety of injunctive relief. *Essex County Preservation Ass'n v. Campbell,* 536 F.2d 956, 962–63 (1st Cir. 1976).

 The court, however, believes that injunctive relief would be appropriate here even under the traditional analysis in injunction cases. In the usual case, a party seeking injunctive relief must meet four requirements: (1) a strong showing of likelihood of success on the merits; (2) a showing of irreparable injury in the absence of injunctive relief; (3) a showing of no adverse impact upon other parties interested in the proceedings; and (4) a showing that injunctive relief would serve the public interest. *Virginia Petroleum Jobbers Ass'n v. FPC,* 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). Here the first requirement has obviously been met since the court has expressed virtually complete agreement with plaintiffs' position and has held that defendants have violated various federal statutes.

 Defendants' primary opposition to injunctive relief is based on a purported lack of a showing of irreparable injury from construction of the powerplant. They contend that any harm to the environment below the dam would flow from operation of the powerplant and not from its construction. If the court were to accept such an agreement, the powerplant might be constructed in full before defendants discovered that no operation plan could be devised which would not result in intolerable damage to the environment. And if operation of the powerplant were enjoined after its construction, the result would be a tremendous waste of resources. The court in *Virginia Petroleum Jobbers, supra,* 259 F.2d at 925, noted that "injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits." Here the court is convinced by plaintiffs' argument on the merits and therefore finds it sufficient on the question of irreparable injury that construction of the powerplant at this time would forever preclude proper consideration by defendants of the reasonable alternatives suggested by plaintiffs and others.

The court further concludes that injunctive relief in these circumstances would serve the public interest. The public unquestionably has a substantial stake in enforcement of NEPA and other similar laws and in preservation of the natural environment. The interests of the public in this action were admirably voiced by representatives of the state of New Mexico, who argued for protection of the waters below the dam because those waters provide important revenue to the state in addition to their recreational and environmental value. Defendants' interests will, of course, not be harmed because they, as public servants, are concerned primarily with the public's welfare.

In light of all the foregoing, the court finds that enjoining of further construction would be appropriate pending defendants' obtaining proper congressional authorization for the project and compliance with NEPA and FWCA. This memorandum opinion constitutes the court's findings of fact and conclusions of law. An appropriate Order accompanies this memorandum opinion.