**UNITED STATES of America,**
**Appellant,**

v.

**Dan T. KENNEDY, Appellee.**

**No. 16179.**

United States Court of Appeals
Ninth Circuit.

April 13, 1960.

William T. Plummer, U. S. Atty., Anchorage, Alaska, Perry W. Morton, Asst. Atty. Gen., A. Donald Mileur, Roger P. Marquis, Attys., Dept. of Justice, Washington, D. C., for appellant.

Davis, Hughes & Thorsness, Anchorage, Alaska, for appellee.

Before HAMLEY, JERTBERG, and KOELSCH, Circuit Judges.

HAMLEY, Circuit Judge.

The United States brought this action to acquire by condemnation two tracts of land within the exterior boundaries of Mount McKinley National Park, in Alaska. Pursuant to a stipulation thereafter entered into with the owner of one of these tracts, an uncontested judgment was entered under which the government acquired that tract. Dan T. Kennedy, owner of the other tract, moved to dismiss the complaint on the ground that it did not state a claim upon which relief can be granted.

The motion was granted and an order dismissing the action as to the Kennedy

tract was later entered. The trial court held that the complaint failed to disclose that there was statutory authority under which the Secretary of the Interior could condemn land in Mount McKinley National Park.[1] The correctness of this determination is the only question before us on this appeal by the government.

The acts relating to the establishment, boundaries, and control of Mount McKinley National Park neither authorize nor forbid the acquisition of land by condemnation.[2] Likewise, the general statutes relating to the jurisdiction and powers of the National Park Service, as such statutes existed in 1951 when the complaint herein was filed, contain no such authorization applicable to the particular tract in question.[3] The government, however, relies upon the general condemnation act of August 1, 1888, as amended, 40 U.S.C.A. § 257, as providing the necessary statutory authority to condemn the Kennedy tract.

The material portion of 40 U.S.C.A. § 257 reads as follows:

"In every case in which the Secretary of the Treasury or any other officer of the Government has been, or hereafter shall be, authorized to procure real estate for the erection of a public building or for other public uses, he may acquire the same for the United States by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the Government to do so * * *."

It has been repeatedly held, and is not here disputed, that under this statute the government's power to condemn is coextensive with its power to purchase. United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 554,

66 S.Ct. 715, 90 L.Ed. 843. But, as the quoted words indicate, the authority to acquire lands which will make the general condemnation statute operative is not conferred by that act but must be found elsewhere. United States v. Certain Lands in Town of Narragansett, R. I., C.C., 145 F. 654.

The authority needed in order to acquire the Kennedy tract is found neither in the statute establishing the park[4] nor in the general statutes relating to the jurisdiction and powers of the National Park Service. But the government relies upon chapter VII of the general appropriation act of 1951, appropriating funds for the National Park Service, as providing the necessary statutory authorization to acquire the Kennedy tract.[5] One provision of chapter VII of that act appropriates $19,667,000 for the construction and improvement of roads, trails, parkways, buildings, utilities, and other physical facilities, "and the acquisition of lands, interests therein, improvements, and water rights; to remain available until expended * * *."

Appellee concedes that the statutory authorization to procure real estate may be evidenced by the making of an appropriation as well as by a specific authorization to acquire. See Polson Logging Co. v. United States, 9 Cir., 160 F. 2d 712, 714. He denies, however, that the 1951 appropriation act upon which the government relies was intended to confer authority upon the Secretary of the Interior, acting through the National Park Service, to acquire land in Mount McKinley National Park.

This appropriation, on its face, contains no direct reference to Mount McKinley National Park or any other national park. In so far as the statutory

1. The opinion and supplemental opinion of the trial court are reported in D.C., 160 F.Supp. 30, 17 Alaska 473 and D.C., 162 F.Supp. 939, 17 Alaska 618.

2. Title 16 U.S.C.A. §§ 347–355.

3. Title 16 U.S.C.A. §§ 1–18d.

4. There are numerous instances in which the Secretary of the Interior, through the

National Park Service, has been given express authority of this kind with reference to other parks or places. Examples of such statutory provisions are cited in the opinion of the trial court. 160 F. Supp. 30, at page 32.

5. Act of September 6, 1950, 64 Stat. 595, 679, 692.

language indicates, the appropriation is for "the acquisition of lands" in any national park. If, then, this appropriation item is to be given a more restricted meaning so as to exclude Mount McKinley National Park, it must be due to compelling legislative history or the limiting effect of other statutes.

With regard to legislative history, appellee argues first that the National Park Service represented and Congress understood that the item for acquisitions would be used only to acquire lands in certain designated areas not including Mount McKinley National Park. This being so, appellee reasons, no part of this appropriation item may be used to acquire land within the exterior boundaries of Mount McKinley National Park.

The National Park Service for fiscal year 1951 requested a total of $275,000 for the purpose of acquiring private properties within the various national parks. This item was deleted by the House of Representatives, but was restored by the Senate.[6] On conference between the House and Senate Committees the Senate version of the act was adopted.[7] There is nothing in the committee reports to indicate that expenditures from this $275,000 item for acquisitions were limited to particular national parks, or that Mount McKinley National Park was excluded therefrom.

Appellee, however, calls attention to the two lists referred to in the Senate hearings in which specific parks are named. One such list is found in the justification which the National Park Service filed in support of the $275,000 appropriation item, as follows:

"It is proposed to use the $275,000 to acquire most urgently needed land

in various areas, including Glacier, Carlsbad Caverns, Mesa Verde, Olympic, Yosemite, Lassen Volcanic, and Sequoia and Kings Canyon National Parks; Colonial and Saratoga National Historical Parks; Gettysburg National Military Park; Manassas National Battlefield Park; and in Dinosaur, Glacier Bay, Death Valley, Saguaro, and Joshua Tree National Monuments." U. S. Congress Senate Hearings, vol. 10, 224 (1949–50)

Mount McKinley National Park is not included in the list set out in the justification. It will be noted, however, that this was not represented to be an all-inclusive list. The justification proposed that the $275,000 be used "to acquire most urgently needed land in various areas, *including* * * *" the named parks and monuments. (Emphasis supplied.) Explaining the list of parks and monuments which was made a part of the justification, Newton B. Drury, Director of the National Park Service, told the Senate subcommittee (Id. at 230):

"Mr. Drury. Yes, those were given in our justification as examples. This is a flexible fund. Now, you asked me about Colonial, and it may well be that there will be purchases there.

"Senator Hayden. There may or may not?

"Mr. Drury. Yes, there may or may not."

A second list which did not include Mount McKinley National Park was filed with the committee by Senator Cordon. However, this list omits eight parks and monuments which were named in the

6. In restoring this item the Senate Committee explained in its report: "The increase of $275,000 approved by the committee is for acquisition of privately owned lands within the authorized boundaries of established national park areas." S.Rep. No. 1941, 81st Cong., 2d Sess., 160 (1950) Cong.Doc.Series No. 11370.

7. Acceptance of the $275,000 item restored by the Senate was not specifically mentioned in the conference report as it did

not require an amendment of the text. The adjustment, however, is reflected in the amount actually appropriated. The statement of the managers on the part of the House notes that the action on the $19,667,000 item "will necessitate some flexibility to permit adjustment of items originally scheduled under . . . construction." H.R.Rep. No. 2991, 81st Cong., 2d Sess., 34, 41 (1950) Cong. Doc. Series No. 11384.

justification,[8] and includes seven parks and monuments which were not named in the justification.[9] This circumstance, it seems to us, is a further indication of the intended flexibility of the $275,000 acquisition item. The written explanatory statement which accompanied the list supplied at the request of Senator Cordon also makes it clear that the list of parks and monuments there named was not intended to be exclusive, but only illustrative.[10]

Senator Cordon later asked Drury whether the justification for $4,827,000 requested for acquisition of lands and water rights carried an itemization of what acquisitions the National Park Service intended to make with the full amount of the request. Drury replied: "Well, except for that $275,000 item, it does." Id. at 241.[11]

The legislative history reviewed above does not, in our opinion, bear out appellee's contention that the National Park Service represented and Congress understood that the $275,000 item would be used only to acquire lands in connection with parks and monuments specifically named in the justification and written statements submitted to the Senate subcommittee. We therefore conclude that such legislative history does not warrant a reading of the appropriation item which would exclude its use for land acquisitions within the exterior boundaries of Mount McKinley National Park.

Appellee also argues that the legislative history of the appropriation indicates that the $275,000 item may be used only to acquire lands where the owner is willing to sell and where the government can get a bargain.[12]

There can be no doubt that the agency intended to use the acquisition fund primarily for purchases at bargain prices. It was largely because of this that the agency could not supply the committee with a list of the specific lands which would be acquired.[13] But it was at no time represented that property would never be acquired by condemnation. On the contrary, the committee was told that this was a continuing pro-

---

8. Carlsbad Caverns, Mesa Verde, and Sequoia National Parks; Colonial and Saratoga National Historical Parks; and Dinosaur, Glacier Bay, and Death Valley Monuments.

9. Mount Rainier, Rocky Mountain, and Big Bend National Parks; Petersburg National Historical Park, Fredericksburg National Military Park; and Muir Woods and Capital Reef National Monuments.

10. This explanatory statement reads as follows:

"*Acquisition of privately owned lands within the authorized boundaries of established areas, $275,000.*

"It is proposed to use this general land acquisition fund primarily to acquire lands in various areas which can be had at bargain prices and such other lands that are urgently needed for construction of public facilities. It is not possible to list the specific lands which will be acquired, for it is not entirely known which properties will be placed on the market, appraisals have not yet all been made and negotiations with the landowners have not been entered into. However, if the sum is granted, it is proposed that it will be expended somewhat as follows: * * *" Id. at 229.

11. In explanation of this amount Drury's prepared statement recites:

"For the past few years, the Congress has provided from $200,000 to $300,000 for the acquisition of privately owned lands located within the boundaries of the areas administered. These owned lands are subject to unsightly commercial development; they stand in the way of ultimate development of the parks and monuments; and they present one of the Service's most perplexing problems in the fields of management and protection. Values of these lands have increased considerably during the past decade because of the enormous increase in public use. They must not be subdivided for summer-home purposes or otherwise developed commercially if the best interests of the Government and the visiting public are to be served." Id. at 195–196. See, also, page 204 of the same report.

12. Appellee goes outside of the record in telling us that the National Park Service has never consulted him concerning the purchase of the tract here in question.

13. See footnote 10.

gram under which considerable property had been acquired by condemnation in past years.[14]

Nothing in the legislative history as reviewed above warrants us in reading such a limitation into that statute.

Appellee argues further that the legislative history of the 1951 appropriations act indicates that the agency was merely attempting to secure necessary funds to buy lands for which it already had purchase authority. Since there was no separate purchase authority with respect to Mount McKinley National Park, it is contended that the appropriation may not be utilized in acquiring the Kennedy tract.

The item of legislative history to which appellee first refers in support of this view is a statement made by D. Otis Beasley, Acting Director, Division of Budget and Administrative Management. Referring to the lump sum item for "construction and land acquisition," Beasley stated that it consolidated all of the appropriations contained in the 1950 appropriation act for construction and land-acquisition activities of the National Park Service. He then stated:

"The language proposed for this item does not in any way broaden the authority heretofore carried in the appropriation items for this purpose.

"Mr. Norrell. It simply constitutes a consolidation of those items and gives you no additional power?

"Mr. Beasley. Yes, sir." Id. pt. 6, at 1650.

The statement that this item in the 1951 act gave the agency no additional powers was in no sense a representation that it would be utilized only in acquiring lands in connection with which there was a separate statutory authorization. Under the 1950 and preceding appropriation acts the agency had expended funds from a similar item for acquisition concerning which there was no separate authorization.[15] Hence a similar utilization of funds from the 1951 appropriation involved no broadening of authority.

Appellee also refers to a colloquy between Senator McCarran and Drury occurring during the Senate subcommittee hearing, which we quote in the margin.[16] Mr. Drury was of course mis-

---

14. Arthur E. Demaray, Associate Director of the National Park Service, stated to the committee:

"When we have had to condemn, we have found that our condemnation prices have exceeded our appraisals. So, most of our work has been by actual negotiation.

"In 1949, we acquired some land under condemnation. It is included in total purchases of 1,350.83 acres at an appraised value of $156,971.67. The contract price has been $111,993; and we have $48,625 in condemnation cases, awards of which have not yet been made. Again our prices for negotiated property have been lower than the amounts awarded by the courts." Hearings on Appropriation Bill, 1951, Before the Subcommittee on Interior Department of the House Committee on Appropriation, 81st Cong., 2d Sess., pt. 2, at 357 (1950).

15. The agency filed with the Senate subcommittee lists showing the parklands acquired with the general acquisition funds for fiscal years 1948, 1949, and 1950. For these three years there are listed several instances where this general ac-

quisition fund had been used to acquire land without there being any authority other than this general fund to acquire such land by purchase or condemnation. The instances referred to include: (1948) Arches National Monument, Glacier Bay National Monument, Chaco Canyon National Monument, and Shiloh National Military Park; (1949) Carlsbad Caverns National Park; (1950) Lassen Volcanic National Park. Appellee does not dispute the government's advice to this court that in at least two of the seven listed instances condemnation proceedings were used: (1948) Chaco Canyon National Monument; (1949) Carlsbad Caverns National Park.

16. "Senator McCarran. Have you not a statute under which you can acquire land within the national parks?

"Mr. Drury. Yes; the act of 1916.

"Senator McCarran. And does that not include provision for the acquisition of land for national parks?

"Mr. Drury. It gives us the authority, yes, Senator; but we still, of course, have to get the appropriations.

"Senator McCarran. And you have to

taken in stating that the acts creating national parks "universally" give the National Park Service authority to acquire land within their boundaries. The act creating Mount McKinley National Park is an instance to the contrary.

Considered in the light of all the other written and oral statements made to the committee by the agency, this particular statement may not fairly be regarded as a specific representation that acquisitions would be made only where there was independent authorization. The past practice over a period of three years, which the agency stated was a continuing program and which was reviewed in detail before the Senate subcommittee, argues to the contrary.

We hold that nothing in the legislative history of the 1951 appropriation act limits the broad language of the acquisition item in such a way that funds therefrom may not be expended in acquiring land within the exterior boundaries of Mount McKinley National Park.

Appellee states in his brief that Congress, having given authority to the Secretary of the Interior to acquire property and if necessary to condemn it in certain specific instances, "has denied the power to the secretary to acquire property by condemnation except where the authority is specifically given." If by this statement appellee intends to state that despite the broad language of the 1951 appropriation act the enactment of special authorizations with regard to named parks constitutes a denial of authority to acquire lands elsewhere, he has failed to document the assertion with any authorities.

Our research has failed to disclose any court decision announcing such a rule, and we are unaware of any general principle which lends it support.[17] Moreover, the consistent practice of the National Park Service over the years has been to the contrary. The fact that Congress continued the same appropriation with knowledge of this administrative understanding and practice constitutes virtual ratification of the administrative construction. Cf. Brooks v. Dewar, 313 U.S. 354, 61 S.Ct. 979, 85 L. Ed. 1399.[18]

The trial court and appellee seem to attach some significance to the fact that the acts relating to the establishment, boundaries, and control of Mount McKinley National Park contain provisos recognizing existing claims, locations, or entries.[19]

In our view this reservation of the existing rights of homesteaders or other claimants within the exterior boundaries of Mount McKinley National Park is irrelevant. The provisos are intended only to make certain that the acts creating Mount McKinley National Park do not of their own force disturb existing

---

get the authority from the Congress to create the park, do you not?

"Mr. Drury. Yes. When the park is created, the act creating it generally, I think universally, gives us the authority to acquire the land within its boundaries." Senate Hearings, op. cit. at 230.

17. In this connection see 3 Sutherland, Statutory Construction sec. 6505 (3d ed. 1943), which states: "The rule that grants of the power of eminent domain are to be strictly interpreted against the government and in favor of the property owner generally has not been applied to federal statutes authorizing executive officers and public service corporations to condemn property. Emphasis has been focused upon the purposes to be accomplished, and such legislation has been treated with extreme liberality to effectu-

ate the promotion of constitutional federal projects."

18. We speak here, of course, of the construction to be placed upon the 1951 appropriation act. We are not concerned with any change of congressional policy which may have occurred since then.

19. Title 16 U.S.C.A. §§ 348, 355. The proviso at the end of section 355, for example, reads:

" * * * Provided further, That nothing herein contained shall affect any valid existing claim, location, or entry under the land laws of the United States, whether for homestead, mineral, right-of-way, or any other purpose whatsoever, or shall affect the rights of any such claimant, locator, or entryman to the full use and enjoyment of his land."

rights. They in no way disable a subsequent Congress from authorizing the acquisition of any such rights by purchase. And, as we have seen, if there was authority to acquire them by purchase, they could be condemned.

We hold that the Secretary of the Interior, acting through the National Park Service, has authority under the 1951 appropriation act to acquire the Kennedy tract.[20] He may therefore do so by condemnation pursuant to the authority conferred under 40 U.S.C.A. § 257.

The judgment is reversed and the cause is remanded for further proceedings.

20. This is on the assumption that the Kennedy tract is within the exterior boundaries of Mount McKinley National Park, a fact not yet determined.