**LIBBY ROD AND GUN CLUB et al.,**
**Plaintiffs-Appellees,**

v.

**John POTEAT et al.,**
**Defendants-Appellants.**

**Nos. 78–3297, 78–3307.**

United States Court of Appeals,
Ninth Circuit.

March 15, 1979.

Carl Strass (argued), Dept. of Justice, Washington, D. C., Nelson L. Bain (argued), of Sullivan, Beauregard, Clarkson, Moss, Brown & Johnson, Washington, D. C., for defendants-appellants.

James H. Goetz (argued), Bozeman, Mont., for plaintiffs-appellees.

Before WRIGHT, KENNEDY and TANG, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This is an appeal from a preliminary injunction which enjoined construction of the Libby Additional Units and Reregulation Dam (hereinafter LAURD) on the Kootenai River in Montana.[1]

The project was authorized by the Flood Control Act of 1950 (the Act), Pub.L. 516, 64 Stat. 170 (May 17, 1950). Construction began on the main dam in 1966, and was completed in 1973. The Act authorized ten generators for the Libby Dam. Four were installed originally in the dam, and the Corps of Engineers (the Corps) intends to add four more as part of the LAURD project.

The additional units cannot be fully utilized without the construction of a reregulating dam downstream to modify river fluctuations resulting from the release of water from the main dam. The Corps, on the assumption that the 1950 Flood Control Act authorized a reregulating dam as well as the main Libby Dam, developed plans for building the reregulating facility. Funds were requested and Congress appropriated money specifically for the reregulating dam.

An Environmental Impact Statement (EIS), fashioned as a final supplement to the impact statement written for the main Libby Dam, was prepared in 1974. Apparently no objections were expressed when the draft EIS was circulated prior to the adoption of the final EIS.

Plaintiffs-Appellees Libby Rod and Gun Club, Montana Wildlife Federation, and Montana Wilderness Association (hereinafter Rod and Gun Club) sued in the district court, for a preliminary injunction enjoining construction of the reregulating facility. The Rod and Gun Club argued that the Corps: (1) violated 33 U.S.C. § 401 by proceeding with construction of the reregulating dam without Congressional approval; (2) violated the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq.; (3) failed to conduct a valid cost-benefit analysis of the project as required by the Flood Control Act of 1936, 33 U.S.C. §§ 701–09a; (4) violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 et seq.; and (5) failed to comply with the National Historic Preservation Act of 1966, 16 U.S.C. §§ 470–470t.

The district court entered a preliminary injunction enjoining all construction on the LAURD project, including the addition of generators to the main Libby Dam. The court based its ruling on two grounds: (1) that the Rod and Gun Club would prevail because Congress had not authorized the LAURD project; and (2) that the Rod and

---

1. At appellant's request these appeals were expedited, argued on February 8, 1979 before a special panel, and considered on the appendix submitted by appellants. We deem that the appeal in 78–3297 has not been perfected, briefed or argued and that appeal is dismissed. Our opinion herein disposes of any issues that might have been raised in that appeal.

Gun Club similarly had demonstrated that the Corps had not complied with NEPA, in that it had failed adequately to consider alternatives to the LAURD project.

The Corps appealed and moved for a stay of the injunction pending appeal. A motions panel of this court denied the motion, but allowed the Corps to continue expansion on the main Libby Dam pending appeal.

## I.

## AUTHORIZATION

Although this is an appeal from the granting of a preliminary injunction, the parties suggest that, because no further evidence is to be presented on the authorization question, the district court's holding on that issue should be treated as a final decision. We conclude that the public interest can be served best by reviewing this aspect of the case as an appeal on the merits.

Congressional authorization is required before a dam may be constructed on a navigable river. 33 U.S.C. § 401 (1976). Section 401 provides in relevant part:

It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any . . . navigable river . . . until the consent of Congress to the building of such structures shall have been obtained . . . .

The section has been interpreted to apply to federal dam construction projects. *United States v. Arizona*, 295 U.S. 174, 183–84, 55 S.Ct. 666, 79 L.Ed. 1371 (1935); *Atchison, Topeka and Santa Fe Railway Co. v. Callaway*, 382 F.Supp. 610, 616 (D.D.C.1974), *vacated* 431 F.Supp. 722 (D.D.C.1977).[2]

## A. THE FLOOD CONTROL ACT OF 1950.

■ The Corps contends that the Act of 1950, which authorized the construction of the main Libby Dam, also authorized a reregulating dam. The Act contains no reference to a reregulation facility. It does incorporate by reference H.R.Doc.No.531, 81st Cong., 2d Sess. (1950), which sets forth the Corps' recommended plans for construction of the Libby Dam. Paragraph 165 of the document states:

165. Reregulation.—A sudden increase of flow from no load at minimum release to full load would raise the river stage at the dam about 15 feet. This sudden rise in stage partly would be absorbed by channel storage, decreasing in amount as its front traveled downstream. It is estimated that the maximum rise would amount to about 5 feet at the city of Libby, less than 3 feet at Troy, and less than 2 feet at Bonners Ferry. Just what effect this stage variation might have along the river is unknown at this time. However, the probable operation of the Libby generating station calls for this wide variation of load very seldom. *If it becomes necessary to reduce this fluctuation, reregulation will be considered when the need arises.*

(Emphasis added.)

The Corps argues that because ¶ 165 placed Congress on notice of the possible need for a reregulating dam if additional turbines were placed in the main Libby Dam, the authorization of the general Libby Dam project contained in the Flood Control Act included explicit authorization of a reregulating facility.

We do not read ¶ 165 to support the conclusion that Congress intended explicitly to authorize a reregulating dam. To the contrary, the paragraph indicates that the need

2. Judge Kennedy suggests in his dissent that this court should not inquire into whether "internal procedures of Congress were correctly followed, precedent to the enactment of a law. *Field v. Clark,* 143 U.S. 649, 672, 676–77, 12 S.Ct. 495, 36 L.Ed. 294 (1892)." We make no such inquiry in this case. Rather, we are confronted with a duly enacted statute that re-

quires Congress as a whole to authorize dam projects, including federally funded projects. It is the duty of the courts, when they must, to inquire whether Congress has satisfied the mandate of 33 U.S.C. § 401. *See United States v. Arizona,* 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935). We therefore do not view § 401 as merely an "internal procedure of Congress."

for a reregulating facility was unclear when the main Libby Dam was authorized, and that the necessity of such a reregulating facility was to be evaluated if and when "the need arises."[3] We agree with the district court that such tentative reference to reregulation cannot be construed as explicit authorization of a reregulating dam.

The Corps further argues that, even if the Flood Control Act cannot be read explicitly to authorize a reregulating dam, it nonetheless authorized the addition of turbines to the main Libby Dam. Because these additional turbines cannot be fully utilized without a second dam, the Corps contends that by authorizing them Congress necessarily authorized the reregulation dam by implication.

We decline to adopt this proposition for two reasons. First, § 401 mandates that the consent of Congress be obtained before beginning construction of a dam. Assuming *arguendo* that certain aspects of the Libby Dam project not specifically referred to by Congress in the Flood Control Act may have been authorized by implication because they are necessary to the effective functioning of the main Libby Dam, we cannot extend such implied authorization to a second dam in light of the requirement that Congress explicitly authorize dam projects. The Corps fails to present this court with applicable authority to support the view that the necessity of a dam will allow a court to infer its authorization, and we feel constrained in this case to follow the clearer dictates of § 401.

Second, the very language of ¶ 165 militates against implying authorization of a second dam. As we have noted, that paragraph indicates that the need for reregulation was uncertain when Congress passed the Flood Control Act, and that the necessi-

ty of a reregulation facility *would be examined "when the need arises."* To conclude that a reregulating dam was authorized by necessity would frustrate the congressional intent to examine the need for a reregulating dam expressed in ¶ 165.

We therefore reject the Corps' first argument that the Flood Control Act of 1950 authorized the reregulating dam, either explicitly or by implication.

### B. CONGRESSIONAL APPROPRIATIONS AND AUTHORIZATION.

■ Congress has on a number of occasions appropriated funds specifically for the construction of the reregulating dam.[4] The Corps contends that such appropriations are equivalent to authorization of the second dam. The Rod and Gun Club conversely argues, and the district court agreed, that the recent Supreme Court ruling in *T. V. A. v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), holds directly that the appropriation of funds should not be construed to represent authorization of a project.

The Rod and Gun Club further buttresses this argument by referring this court to a number of cases where congressional funding of a project has not been viewed as representing implicit authorization of that project. *See e. g. Greene v. McElroy*, 360 U.S. 474, 505, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *D. C. Federation of Civic Associations v. Airis*, 129 U.S.App.D.C. 125, 128–29, 391 F.2d 478, 481–82 (1968).

We are not convinced that these cases address issues that are necessarily analogous to those presented by this appeal, nor that they mandate the conclusion that courts can never construe appropriations as congressional authorization. However, we

---

3. We note in this regard that H.R.Doc.No.531 contains an extended and detailed discussion of several aspects of the Libby Dam. However, the document's sole reference to reregulation is in paragraph 165.

4. The record is unclear as to exactly how much of the estimated $250,000,000 cost of the LAURD project has been appropriated. Counsel at oral argument indicated that Congress

has appropriated approximately $35,000,000 to date.

The LAURD project, however, includes *both* installation of additional generators on the main dam and construction of the reregulating dam. The Corps has not indicated what portion of the $35,000,000 was appropriated for the reregulating dam alone.

do conclude that *T. V. A. v. Hill*, although clearly distinguishable on the facts, nonetheless creates serious questions as to the Corps' claim that the appropriation of funds for a project should generally be regarded as project authorization. *Id.* 437 U.S. at 190–92, 98 S.Ct. 2279.[5]

Reviewing the facts of this case, we find no evidence in the record that Congress intended the appropriations for the reregulating dam to be regarded as the authorization required by § 401, or that Congress as a whole believed that the reregulating dam had been authorized.

Admittedly, there is some evidence that when the Corps approached Congress for funds for the reregulating dam it asserted without challenge by congressional committee members that the dam had been authorized. Moreover, at least one report of the Senate Committee on Public Works refers to the reregulating dam as if it had been authorized. S.Rep.No.93–615, 93rd Cong., 1st Sess. 64 (1973).

We are hesitant, as was the Supreme Court in *T. V. A. v. Hill*, to interpret isolated remarks in committee hearings or reports as expressions of the intent or knowledge of Congress. *T. V. A. v. Hill, supra*, 437 U.S. at 191–92, 98 S.Ct. 2279; *see S. E. C. v. Sloan*, 436 U.S. 103, 121, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978).

We are confronted in this case with a specific statute that requires congressional authorization of dam projects. We find no evidence that the remarks contained in the committee reports, which asserted that such authorization had been obtained, were the product of a considered review of the issue.

We similarly find no indication that the appropriations for the reregulating dam were intended to satisfy the mandate of § 401,[6] and in fact there is some indication that Congress might have mistakenly relied upon assertions by the Corps that the LAURD project had been specifically authorized when it appropriated funds for the project. *See, e. g., Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations, Hearings on H.R.No.18127 Before the Senate Appropriations Committee*, 91st Cong., 2d Sess. 1779 (1971).

Without expressly reaching the general question whether appropriations as a rule constitute authorization, we find in this case that the congressional authorization required under § 401 was not conferred by appropriations alone. *See Atchison, Topeka and Santa Fe Railway Co. v. Callaway, supra*, at 620.

### C. THE WATER RESOURCES DEVELOPMENT ACT.

■ The Corps finally argues that the Water Resources Development Act of 1974 authorized the construction of generators in the reregulating dam, and that the reregu-

---

**5.** The cases relied upon by the dissent to reach a contrary conclusion involve the limited issue of land condemnation. In such a context, this court and others have held that when a government officer has been given broad congressional authorization to acquire land for public uses, statutory authorization to procure specific real estate "may be evidenced by the making of an appropriation as well as by a specific authorization to acquire." *See, e. g., United States v. Kennedy*, 278 F.2d 121, 122 (9th Cir. 1960); *Polson Logging Co. v. United States*, 160 F.2d 712, 714 (9th Cir. 1947).

In light of more recent decisions, we hesitate to apply these land condemnation cases to the question whether appropriations alone will satisfy the specific consent requirement of § 401.

Similarly, neither *United States v. Arizona*, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935), nor *Wisconsin v. Duluth*, 96 U.S. 379, 24 L.Ed.

668 (1877), is factually analogous to this case. Neither decision holds explicitly that appropriations constitute congressional authorization for dam construction.

**6.** In *T. V. A. v. Hill*, the Supreme Court was confronted with a record showing that various congressional committees had specifically opined that continued construction of the Tellico Dam was proper notwithstanding the Endangered Species Act. 437 U.S. at 170–71, 98 S.Ct. 2279. The Court nonetheless held that such statements were not persuasive evidence that Congress as a whole intended to repeal that Act. *Id.* at 191, 98 S.Ct. 2279. In this case, the Corps has offered no evidence that the various appropriations committees ever considered the authorization issue. Thus, we find even less direct evidence than existed in *T. V. A. v. Hill* that Congress intended appropriations to be equated with authorization.

lation dam was therefore authorized by necessity.

The Water Resources Development Act provides in relevant part:

Sec. 1. (a) The Secretary of the Army, acting through the Chief of Engineers, is hereby authorized *to undertake the phase 1 design memorandum stage of advanced engineering and design* of the following multi-purpose water resources development projects, substantially in accordance with, and subject to the conditions recommended by the Chief of Engineers in, the reports hereinafter designated. . . .

The project for installation of power generating facilities at the Libby Reregulating · Dam, Kootenai River, Montana: Senate Document Numbered 93–29, at an estimated cost of $75,000.

88 Stat. 12–13. (Emphasis added.)

We agree with the Rod and Gun Club that that Act on its face authorizes only advance design studies, and not the construction of generators for the reregulating dam. Although explicit authorization of generators for the reregulating dam would create a strong inference that Congress intended to authorize the facility in which they were to be placed, we do not find that the authorization only of design studies is equally persuasive. We conclude that the Water Resources Development Act did not authorize the reregulating dam by necessity.

### D. CONCLUSION.

Because the reregulating dam has not been authorized by Congress as required by § 401, this court need not look further at the equities employed by the district court to support the injunction. *United States v. City and County of San Francisco*, 310 U.S. 16, 30–31, 60 S.Ct. 749, 84 L.Ed. 1050 (1940). Our conclusion that the reregulating dam was not authorized bars its continued construction.

### II.

### THE ENVIRONMENTAL IMPACT STATEMENT

In light of our conclusion that the reregulating dam was not authorized by Congress,

we do not reach the issue of the adequacy of the Environmental Impact Statement. If the Corps approaches Congress for authorization of the LAURD Project, it may well find it necessary either to prepare a new EIS or update the one adopted in 1974 to reflect recent · developments noted by the district court. In any event, the environmental issues presented when and if the reregulation dam is authorized will likely turn on facts substantially different than those presented here, and are best left to the district court's determination.

### III.

### THE DISTRICT COURT'S ENJOINING OF THE ADDITION OF TURBINES TO THE LIBBY DAM

■ There is no dispute that the addition of four turbines to the main Libby Dam was authorized by the Flood Control Act of 1950. Although such turbines may not be fully utilized without a reregulating dam, we feel that the court erred in enjoining their installation. Because the turbines have been authorized, the decision whether to proceed with their installation in light of our holding as to the reregulation dam is one for the Corps and Congress, not for us. We see no adverse environmental· impact resulting from the addition of the turbines alone, and therefore reverse the district court's order as it pertains to the continued construction and installation of the turbines authorized for the main Libby Dam.

Presently pending are motions by the Corps for reconsideration of our earlier order denying the Corps' request for a stay of the injunction pending appeal, a motion by the Corps for summary reversal, and a motion by the Rod and Gun Club for clarification of our order allowing for continued expansion on the main Libby Dam.

Consistent with our holding on the authorization question, the Corps' motion for reconsideration and for summary reversal are denied. The Rod and Gun Club's motion

for clarification relates to the issue whether the Corps should be allowed to construct additional turbines in the main Libby Dam, and is addressed by Section III of this opinion.

The Corps is enjoined from awarding contracts for the construction of the reregulating dam until authorization therefor is obtained from Congress.

Reversed in part and affirmed in part.

KENNEDY, Circuit Judge, dissenting:

The principal holding of the court is that construction of the Libby reregulating dam does not have authorization or consent from Congress. As I can agree with neither the reasoning used to reach that conclusion nor the majority's analysis of the precedents bearing on the case, I respectfully dissent.

At the outset, it should be understood that the language of 33 U.S.C. § 401 assists us in resolving certain preliminary matters, but it does not answer the ultimate question we face. It is relevant, though not especially helpful, in determining whether or not the plaintiffs have a private right of action to challenge these expenditures as unauthorized.[1] The language is relevant also to indicate that agencies of the federal government, as well as states and private entities, must obtain consent from Congress prior to constructing a dam in a navigable

river. *See United States v. Arizona,* 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935). Thus the Corps of Engineers may not, and it does not, rely for its authority to proceed upon some general authorization from Congress not addressed to this specific project. Beyond these questions, however, the statute provides little assistance in resolving the principal issue confronting us, which is whether Congress has in fact approved the expenditures in question. The majority deems the word "consent" in the statute to mean "authorization," and I have little objection to this translation except to note that it simply restates the question without answering it. The problem then is whether or not Congress has authorized the Corps to spend funds for construction of this project. Based on the legislative history before us, I conclude it did.

Before the fiscal year 1978, Congress made several specific appropriations for the Libby Additional Units and Reregulating Dam project (LAURD), which consists of construction of the reregulating dam and additional power units to be installed in the main dam.[2] The Corps of Engineers now proposes to let contracts pursuant to the further appropriation of $10,000,000 made in fiscal year 1978. That appropriation addressed specific aspects of the construction for this project, as is shown in the margin.[3]

1. This difficult question is not addressed by the majority. I do not discuss it in detail because I find plaintiffs' challenge without merit on other grounds. *See Red Star Towing and Transportation Co. v. Department of Transportation,* 423 F.2d 104, 106 (3d Cir. 1970) (no private right of action under 33 U.S.C. § 401). *See also Hooper v. United States,* 331 F.Supp. 1056, 1058 (D.Conn.1971). *Cf. Guthrie v. Alabama By-Products Co.,* 328 F.Supp. 1140, 1148 (N.D.Ala. 1971), *aff'd* 456 F.2d 1294 (5th Cir. 1972), *cert. denied,* 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973). *See generally Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *But see Sierra Club v. Morton,* 400 F.Supp. 610, 622–25 (N.D.Cal.1975).

In *Alameda Conservation Association v. California,* 437 F.2d 1087 (9th Cir.), *cert. denied,* 402 U.S. 908 (1971), this circuit stated that a challenge under 33 U.S.C. § 403 was sufficient to "invoke the jurisdiction of the court." *Id.* at

1094. Possibly the court's holding was only that the plaintiffs in question had standing to bring the lawsuit.

2. After passage of the Flood Control Act of 1950, Congress since 1952 has appropriated money for the LAURD project every year except 1955–60. Although the record is unclear, the first appropriation directed specifically at the reregulating dam appears to have been in 1973, when $400,000 was appropriated for planning of the reregulating dam.

3. The appropriation involved in this case is for fiscal year 1978. During Public Works for Water and Power Development and Energy Research Appropriation Bill: Hearings Before a Subcommittee of the Committee on Appropriations, 95th Cong. 1st Sess. 1762 (Feb. 22, 1977), the appropriations were described by the Corps as follows:

I find little support for the majority's conclusion that appropriations for specific aspects of reregulating dam construction does not constitute consent for the expenditures. The majority suggests that Congress may have been laboring under a mistake in voting on the appropriation, since the Corps stated before various congressional committees that the reregulating dam was authorized by the 1950 Flood Control Act.[4]  I

FISCAL YEAR 1978:  The requested amount of $10,000,000 will be applied as follows:

| | AMOUNT |
|---|---|
| Continuation land acquisition | $1,200,000 |
| Initiate relocation of railroad and road | 1,605,000 |
| Initiate reservoir clearing and project access roads | 1,215,000 |
| Initiate procurement of multilevel intake structures generators and governors | 2,200,000 |
| Continue procurement of turbines | 550,000 |
| Continue cultural resources preservation | 260,000 |
| Relocate U.S. Forest Service sanitary facilities at Canoe Gulch | 170,000 |
| Engineering and Design | 2,000,000 |
| Supervision and administration | 800,000 |
| TOTAL | $10,000,000 |

The recent appropriations history of the reregulating dam project is provided in the following chart, introduced by the Corps at *id.* at 1765:

| APPROPRIATION TITLE: CONSTRUCTION GENERAL | | CLASSIFICATION: MULTIPLE PURPOSE PROJECTS INCLUDING POWER | | | |
|---|---|---|---|---|---|
| **SUMMARY CONSTRUCTION PROGRAM (PB-1)** | | | | | |
| FISCAL YEARS 19 77 AND 19 78 | | | | | |
| ITEM | PROJECT COST ESTIMATE | TOTAL TO 30 SEP 19 76 | CURRENT FY 19 77 | BUDGET FY 1978 | BALANCE TO COMPLETE AFTER FY 19 78 |
| (a) | (b) | (c) | (d) | (e) | (f) |
| 1 LANDS AND DAMAGES | 3,450,000 | 6,000 | 200,000 | 1,200,000 | 2,044,000 |
| 2 RELOCATIONS | 43,400,000 | | 200,000 | 1,475,000 | 41,725,000 |
| 3 RESERVOIR | 3,100,000 | | | 550,000 | 2,550,000 |
| 4 DAM | 54,900,000 | | | 860,000 | 54,040,000 |
| 5 POWER PLANT | 70,700,000 | | 75,000 | 1,150,000 | 69,475,000 |
| 6 ROADS | 2,260,000 | | | 705,000 | 1,555,000 |
| 7 CULTURAL RESOURCES PRESERVATION | 1,250,000 | | 180,000 | 260,000 | 810,000 |
| 8 BUILDINGS, GROUNDS, AND UTILITIES | 1,620,000 | | | | 1,620,000 |
| 9 PERMANENT OPERATING EQUIPMENT | 70,000 | | | | 70,000 |
| 10 ENGINEERING AND DESIGN | 11,400,000 | 2,019,000 | 1,165,000 | 2,000,000 | 6,216,000 |
| 11 SUPERVISION AND ADMINISTRATION | 10,850,000 | 80,000 | 200,000 | 800,000 | 9,770,000 |
| 12 | | | | | |
| 13 | | | | | |
| 14 TOTAL APPLIED COST | 205,000,000 | 2,105,000 | 2,000,000 | 9,000,000 | 191,895,000 |
| 15 Undistributed Cost | | | | 1,000,000 | -1,000,000 |
| 16 TOTAL PROJECT COSTS | 205,000,000 | 2,105,000 | 2,000,000 | 10,000,000 | 190,895,000 |
| 17 Pending Adjustments | | | | | |
| 18 TOTAL COST | 205,000,000 | 2,105,000 | 2,000,000 | 10,000,000 | 190,895,000 |
| 19 Undelivered Orders | | | | | |
| 20 TOTAL OBLIGATIONS | 205,000,000 | | 2,000,000 | 10,000,000 | 190,895,000 |
| 21 | | | | | |
| 22 | | | | | |
| 23 METHOD OF FINANCING | | | | | |
| 24 Allocations | | 2,105,000 | 2,000,000 | | |
| 25 Unobligated Carryover from Prior Year | | | | | |
| 26 Total Funds Available for Obligation | | 2,105,000 | 2,000,000 | | |
| 27 Appropriations Required | | | | 10,000,000 | 190,895,000 |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |

| EFFECTIVE DATE 1 January 197 | DIVISION NORTH PACIFIC DISTRICT SEATTLE | REGION COLUMBIA NORTH PACIFIC BASIN KOOTENAI | PROJECT LIBBY ADDITIONAL UNITS AND REREGULATING DAM, MONTANA |
|---|---|---|---|

---

4.  References to the reregulating dam may be found in:  S.Rep. No. 93–615, 93d Cong., 1st Sess. 64–67 (1973);  Public Works for Water and Power Development and Energy Research Appropriation Bill, 1977: Hearings Before a House Subcommittee of the Committee on Appropriations, 94th Cong. 2d Sess. 1589 (Feb. 24, 1976);  *Id.*: Hearings Before the Senate Com-

suppose the majority's reasoning is that if Congress had been alerted to the ambiguous nature of the asserted prior authorization, it would not have passed the appropriation measure in question here. There is no evidence supporting that conclusion. Even assuming that there was a procedural flaw because Congress did not follow the normal course of making a separate declaration to authorize the project before appropriating money for its construction, the majority gives no reason at all for departing from the general rule that the courts may not inquire into whether or not the internal procedures of Congress were correctly followed, precedent to the enactment of a law. *Field v. Clark,* 143 U.S. 649, 672, 676–77, 12 S.Ct. 495, 36 L.Ed. 29 (1892). The enactment of a statute is conclusive in the courts on the issue of regularity in legislative proceedings.

Rule 21, Manual of House of Representatives, specifies that an appropriations measure is out of order unless the expenditure is previously authorized by law.[5] The prescribed remedy for violation of the rule is that if a point of order is raised, the bill will not be heard. It does not follow that an appropriations measure heard out of order and passed without objection is not genuine congressional approval of the expenditure. Congress would no doubt be surprised to learn that a private party can prevent expenditure of appropriated federal funds by asserting a violation of its own internal procedures.

No great danger of unchecked legislation by appropriation results from what I suggest should be this court's refusal to oversee congressional adherence to its own rules. Congress is fully capable to control the conduct of its members and to remedy as it deems appropriate any previous enactment it finds unwise.

The majority requires, without any indication of the standards to which Congress must conform, some degree of formal authorization before it would permit an agency to implement appropriations. Appropriations for construction projects such as LAURD are voted upon in conjunction with other similar projects. The record in this case suggests that little or no extended discussion is given on the floor of the Congress to any particular project. Even a specific statement on the floor by a congressman that a vote for appropriations on a particular project is intended to show authorization, either in itself or as a ratification of prior ambiguous expressions, might be dismissed under the majority's view as being the opinion of one legislator rather than the will of Congress. In short, it is difficult to imagine that the majority has not decided the question it purports to avoid, namely, whether appropriations as a general rule can constitute authorization.

I believe that we can find adequate independent expressions of congressional intent to authorize the project in the particular circumstances of this case. The express recognition in 1950 that a reregulating dam might be necessary; express authorization and appropriations for additional turbine units in the main Libby dam that could not operate without the reregulating dam; statements by the Corps in congressional hearings and reports, circulated to congressmen before they vote on an appropriations bill, that LAURD was authorized by the Flood Control Act; and appropriations for work on the reregulating dam, justify the conclusion that Congress considered that proper authorization had been given.

mittee on Appropriations, 94th Cong., 2d Sess. 1379 (Feb. 24, 1976); *Id.:* Hearings Before the Senate Committee on Appropriations, 94th Cong., 2d Sess. 199 (May 26, 1976); *Id.,* 1978: Hearings Before a House Subcommittee of the Committee on Appropriations, 95th Cong., 1st Sess. 1637, 1761–65; *Id.:* Hearings Before the Senate Committee on Appropriations, 95th Cong., 1st Sess. 1964–65, 1995–96, 2074–77, 2192 (March 2, 1977); *Id.* at 212 (May 24, 1977); Conference Report on H.R. 14236, Cong.

Rec. H6831 (June 25, 1976); Conference Report on H.R. 7553, Cong.Rec. H7519 (July 20, 1977).

5. House Rule XXI(2) provides in part:

No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless in continuation of appropriations for such public works as are already in progress.

While I am somewhat reluctant to say that an appropriation always satisfies the requirements of section 401, the few cases which have addressed the point tend to support that conclusion, and they show that the appropriations authorize the disputed expenditures in this case. In *United States v. Right to Use, etc., Land,* 484 F.2d 1140 (4th Cir. 1973), the issue was whether the Secretary of the Army had authority to condemn certain property. A statute denied the Army authority to acquire real property unless the acquisition was "expressly authorized by law." 10 U.S.C. § 2676. The Army argued that the Appropriations Act of January 11, 1971 constituted authorization since it provided "for expenses necessary for . . . lease, and operation of equipment, as authorized by law." Army officials, in testimony before appropriations committees, had stated their intention to use some of the requested funds to acquire the property in question. The court held, "[A] general appropriations act provides a sufficient basis for condemnation if Congress intended the act to authorize the acquisition." *Id.* at 1142. The court reasoned:

> Because this information was before Congress when it voted, we hold that enactment of the appropriations bill sufficiently indicates a congressional intent to authorize the Secretary to acquire the leasehold and that no additional statutory authorization is necessary. *Cf. United*

*States v. Mock,* 476 F.2d 272, 274 (4th Cir. 1973); *United States v. Kennedy,* 278 F.2d 121 (9th Cir. 1960); *Polson Logging Co. v. United States,* 160 F.2d 712 (9th Cir. 1947).

The case is in point here,[6] and the two Ninth Circuit cases on which it relies seem to undermine the majority's position.

In *United States v. Kennedy,* 278 F.2d 121 (9th Cir. 1960), the Secretary of the Interior sued to condemn land within a national park. The court found no authorization statute applicable to the tract in question. *Id.* at 122. It then held that the appropriations act which supplied funds for, among other things, "acquisition of lands" by the National Park Service, provided the necessary authorization.[7]

Operation of 33 U.S.C. § 401 was addressed in *United States v. Arizona,* 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935). At issue was the construction of Parker Dam, a project Congress had not authorized by the appropriation of monies or in any other manner. The dam was to be financed entirely by the Metropolitan Water District of Southern California. The United States brought suit to enjoin the State of Arizona from interfering with the project. The court concluded there was no congressional approval for the project and dismissed the Government's suit. In a discussion with implications for this case, the court referred to Laguna Dam, a completed project cited by the Government to support the proposi-

---

**6.** *Environmental Defense Fund, Inc. v. Corps of Engineers,* 325 F.Supp. 749 (E.D.Ark.1971), aff'd on other grounds, 470 F.2d 289 (8th Cir. 1972), is not directly in point but is nevertheless relevant. One of the plaintiff's claims was that although a dam project had been originally authorized, the Corps was proceeding in excess of, and in violation of, that authorization. *See id.* at 754. In dismissing plaintiff's complaint as to this count, the court stated:

> It is the Court's opinion that it is the sole prerogative of the Congress of the United States to determine if the project is proceeding in accordance with its authorization, and, if not, to determine what, if anything, it wishes to do about it. The Congress has the means to bring such matters to its attention and the power, through appropriations and otherwise, to deal with such problems as it deems fit.

*Id.* at 754–55.

**7.** In *Polson Logging Co. v. United States,* 160 F.2d 712 (9th Cir. 1947), the Secretary of Agriculture instituted eminent domain proceedings to acquire land "for the purpose of a road intended to service a national forest." *Id.* at 713. The Secretary was authorized in general language to administer the national forests, 16 U.S.C. §§ 473–482. The court held that "statutory authorization to procure real estate may be evidenced by the making of an appropriation as well as by a specific authorization to acquire." 160 F.2d at 714. It concluded that general appropriations for expenses necessary for use, maintenance, and improvement of the park system authorized the taking in question. Perhaps the case is distinguishable in that the Secretary had prior general authority to operate the parks.

tion that the Parker Dam was also authorized. The court agreed that independent authorization of the Laguna project was doubtful, but stated, "Congress has made appropriations for the benefit of the project of which it is a part, and so recognized and approved the building of the dam. *Wisconsin v. Duluth,* 96 U.S. 379, 386, 24 L.Ed. 668." This is an explicit recognition that appropriation of funds may constitute requisite congressional consent for construction of a dam, as is the Court's decision in *Wisconsin v. Duluth,* 96 U.S. 379, 383–86, 24 L.Ed. 668 (1877).

The majority's opinion here appears to rest in large part on a misperception of the relevance of *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). There is no question that Tellico Dam, the project at issue in the case, was expressly authorized and funded by appropriations, and it was unnecessary to consider 33 U.S.C. § 401. The Court held that Congress, by its express authorizations and appropriation of funds for the project, did not intend to repeal by implication the clear substantive provisions of other statutes. The case deals with the relationship of project authorization to the mandates of other federal statutes, not with the manner in which Congress declares consent under section 401. In the case before us, no one argues that a finding of consent under section 401 would by implication repeal provisions of the Endangered Species Act or the National Environmental Policy Act. For similar reasons, *Hill*'s discussion of the role of committee hearings and reports in interpreting congressional intent, *see* 437 U.S. at 189–92, 98 S.Ct. 2279, has no bearing on this case.

*Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), which is the second featured precedent of the majority opinion, is not relevant either. At issue was the validity of a security clearance program implemented by the Defense Department. The court simply held that various peripheral statutes and general congressional appropriations for security programs did not imply approval of the specific procedures, which were of doubtful constitutionality. The court noted that the procedures were not before congressional committees which considered the appropriations question. *Id.* at 505, 79 S.Ct. 1400. *D.C. Federation of Civic Associations v. Airis,* 129 U.S. App.D.C. 125, 391 F.2d 478 (1968), is also inapposite. That opinion held only that a congressional lump sum appropriation for street and highway construction in the District of Columbia did not authorize the district to disregard its own procedural requirements for planning and construction, requirements entirely consistent with the appropriations measure. Similar considerations distinguish other cases such as *National Audubon Society v. Andrus,* 442 F.Supp. 42 (D.D.C.1977) (appropriations bill does not ratify an otherwise insufficient environmental impact statement).

The authority most closely in point to support the rationale of the court is *Atchison T. & S. F. Ry. v. Callaway,* 382 F.Supp. 610 (D.D.C.1974), vacated on other grounds, 431 F.Supp. 722 (D.D.C.1977). While it might be possible to distinguish *Callaway* on narrow grounds, broad language in the opinion does conflict with my view of section 401. The reasons set forth above, including the controlling law of this circuit, point rather conclusively against the result reached by the majority, and I would not follow the decision of the district court in the *Callaway* case.

I acknowledge that, from one perspective, there are sound arguments favoring a two-step procedure, first authorization and then appropriation, so that Congress can consider the substantive justification of a project separately from the fiscal consequences of funding it. It might be argued that a project which passes this two-stage procedure is a more reliable expression of congressional approval for the entire project. On the other hand, it cannot be doubted that appropriation hearings are often the framework for a detailed analysis of the costs of a project and of the necessity and the wisdom for incurring those costs. If Congress concludes that a project should be postponed or terminated because it is no longer needed, it may simply decide not to continue its funding. Thus, it is unclear to

me what one gains by requiring separate authorization as a necessary element of consent, even if this circuit's precedents permitted such a rule. However desirable it might be for the courts to enjoin expenditures of appropriated funds where it thinks there are substantial defects in the authorization process, I would not impose such a sweeping requirement without an express declaration from Congress that it wants us to undertake this policing function.

Under either the majority view or that expressed in my dissent, Congress can by further law announce its intent with regard to this project. Conceding the question before us to be a close one, I think that proper respect for the actions of the legislative branch of the Government requires us to permit expenditure of the funds that it has specifically appropriated, given all of the circumstances in this case.

In view of the majority's disposition, I find it unnecessary to consider whether or not the EIS filed for this project was in full compliance with the requirements of the National Environmental Policy Act. For the reasons expressed above, I dissent from the judgment of the court.