996 F.2d 338
 Fed. Carr. Cas. P 83,840, 302 U.S.App.D.C. 72
 OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.; Ruth
F. Jones; John S. Tuttle, doing business as J-T
Trucking; Gordon Betts, Petitioners,
v.
Federico F. PENA, Secretary, U.S. Department of
Transportation; E. Dean Carlson, Acting
Administrator, Federal Highway
Administration; United States
of America, Respondents.
 No. 92-1662.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 26, 1993.
Decided June 18, 1993.
 
 Petition for Review of Orders of the Secretary of Transportation and the Administrator, Federal Highway Administration.
 Paul D. Cullen, Washington, DC, argued the cause for the petitioners. With him on the briefs were K. Michael O'Connell and Daniel J. Harrold, Washington, DC.
 Robert V. Zener, Appellate Litigation Counsel, U.S. Dept. of Justice, Washington, DC, argued the cause for the respondents. With him on the brief was Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, DC.
 Erika Z. Jones, John J. Sullivan, Washington, DC, and Daniel R. Barney, Alexandria, VA were on the brief for amicus curiae, The American Trucking Associations, Inc.
 Before: WALD, HENDERSON, and RANDOLPH, Circuit Judges.
 RANDOLPH, Circuit Judge:
 
 
 1
 The first--and, as it turns out, the last--question we must decide in this case is whether we have jurisdiction to hear it. Invoking the Hobbs Act, 28 U.S.C. § 2342, three commercial truck drivers and an organization representing truck owner-operators filed a petition for review challenging, under the Fourth Amendment to the Constitution, the Department of Transportation's funding of a pilot program in four states to conduct random drug and alcohol tests of truckers. We hold that the case cannot be brought in the court of appeals and therefore dismiss the petition.
 
 
 2
 Section 5 of the Omnibus Transportation Employee Testing Act of 1991, Pub.L. No. 102-143, tit. V, § 5(b)(1), (2), (3) & (4), 105 Stat. 961, directed the Secretary of Transportation to select four states "of varying geographical and population characteristics" to participate for one year in "a pilot test program for the purpose of testing the operators of commercial motor vehicles on a random basis to determine whether an operator has" illegally used "alcohol or a controlled substance." After the pilot program expires, the Secretary must report to Congress on the results. Id. § 5(b)(5). Congress made available $5 million in grant money for the four participating states. Id. § 5(b)(6). The Secretary administers the pilot program under the Motor Carrier Safety Assistance Program, id. § 5(b)(1), which provides grants to states to develop and implement programs for the enforcement of "Federal rules, regulations, standards, and orders applicable to commercial motor vehicle safety and compatible State rules, regulations, standards, and orders." 49 U.S.C.App. § 2302(a). To qualify for a grant, a state must submit a plan to the Secretary. See 49 U.S.C.App. § 2302(b); 49 C.F.R. §§ 350.11, 350.13; 49 C.F.R. pt. 350, app. A at 472-73. When approved, the state plan "serve[s] as the basis for monitoring and evaluating performance of the State under the grant." 49 C.F.R. § 350.11(b).
 
 
 3
 In May 1992, the Department of Transportation issued a press release announcing that Nebraska, Utah, Minnesota, and New Jersey had been selected as the four pilot program states. In early July 1992, the Secretary entered into grant agreements giving each state approximately $1.25 million to run its program. The four states had submitted plans to the Secretary outlining how they intended to conduct random alcohol and drug testing of truck drivers. The plans, which are included in the joint appendix to the briefs, contain some similarities and many differences. According to petitioners, "[i]t appears that the states proceed on two different tracks in implementing the testing, i.e., a probable cause track and a so-called 'voluntary' track." Petitioners' Brief at 6 n. 3.[1] Focusing on the "voluntary" track, petitioners say the random testing is not really voluntary because uniformed state law enforcement officers may be involved (as the programs for Nebraska, Minnesota and New Jersey, but not Utah, apparently allow) and because a driver may face consequences--such as the state's notifying his employer--if he refuses to consent to testing.[2]
 
 
 4
 In their reply brief, petitioners describe their petition for review, filed on December 22, 1992, as a facial challenge to "the Pilot Program" raising "purely legal" issues that may be resolved without reference to facts. It could hardly be otherwise. The case comes before us without any factual findings, without any rulemaking proceedings and, indeed, without anything resembling an administrative record. We have the statute, the four state plans, the grant agreement each state entered into with the Federal Highway Administration, and an appendix in which petitioners have assembled affidavits, memoranda and letters of no particular moment, some apparently collected through a Freedom of Information Act request. Since petitioners now say theirs is a facial constitutional challenge, if we had jurisdiction we would have to decide whether "the Pilot Program"--whatever that might comprehend--was incapable of being administered in a constitutional fashion. See Reno v. Flores, --- U.S. ----, ----, 113 S.Ct. 1439, 1446, 123 L.Ed.2d 1 (1993); Skinner v. Railway Labor Executives Ass'n, 489 U.S. 602, 632-33 n. 10, 109 S.Ct. 1402, 1421, n. 10, 103 L.Ed.2d 639 (1989).
 
 
 5
 Petitioners, joined by the Secretary, tell us that our jurisdiction to render a judgment on the merits rests on "28 U.S.C. § 2342(3)(B)(5)." Petitioners' Brief at 1; Brief for Respondents at 1. This is an obvious error. There is no " § 2342(3)(B)(5)." Section 2342 does contain a subsection (3)(B)(v), but it deals with rules and orders of the Federal Maritime Commission. We suppose the parties had in mind 28 U.S.C. § 2342(5). In part, this grants jurisdiction to the courts of appeals to review "all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title...." The link between this provision and actions of the Secretary of Transportation dates to 1966, when Congress created the Department of Transportation and transferred to the Department powers then held by other agencies. 49 U.S.C.A. § 1655 (1976 ed.). In that year the newly formed Department of Transportation took over some authority then held by the Department of Commerce, § 1655(a); the Coast Guard, § 1655(b); the Department of the Treasury, § 1655(b); the Federal Aviation Administration, § 1655(c); the Civil Aeronautics Board, § 1655(d); the ICC, § 1655(e); the Army, § 1655(g); and the Department of the Interior, § 1655(i).
 
 
 6
 As to judicial review of orders and other action by the Secretary of Transportation, Congress provided thus:
 
 
 7
 Orders and actions of the Secretary in the exercise of functions, powers, and duties transferred under this chapter, and orders and actions of the Administrators pursuant to the functions, powers, and duties specifically assigned to them by this chapter, shall be subject to judicial review to the same extent and in the same manner as if such orders and actions had been by the department or agency exercising such functions, powers, and duties immediately preceding their transfer.
 
 
 8
 49 U.S.C. § 1653(c). After 1966, whenever the Secretary exercises functions pursuant to authority transferred to his Department from the ICC, § 1653(c) therefore dictates that judicial review occur "in the same manner as if" the functions had been retained by the ICC--that is, in the court of appeals on a petition for review pursuant to 28 U.S.C. § 2342(5).
 
 
 9
 In Center for Auto Safety v. Skinner, 936 F.2d 1315 (D.C.Cir.1991), we held that courts of appeals, rather than district courts, had jurisdiction over challenges to regulations "issued by the Federal Highway Administration, a part of the Department of Transportation ("DOT"), pursuant to authority transferred from the Interstate Commerce Commission ("ICC") to DOT under the Department of Transportation Act." Id. The First Circuit reached the same result in Cousins v. Secretary of U.S. Department of Transportation, 880 F.2d 603 (1st Cir.1989) (en banc), a challenge to a Transportation Department regulation prohibiting deaf individuals from working as truck drivers, a regulation " 'relating generally to qualifications ... of employees and safety of operation and equipment.' " Id. at 611 (quoting 49 U.S.C.A. § 1655(e)(6)(C) (1976 ed.)) (ellipsis in original). "Thus, the ICC was the 'agency exercising' driver safety regulations 'functions ... immediately preceding their transfer' to DOT, and judicial review of DOT's exercise of these functions must take place 'in the same manner as' it would if the ICC exercised them." Id. (quoting 49 U.S.C. § 1653(c)) (ellipsis in original). In Owner-Operators Independent Drivers Ass'n v. Skinner, 931 F.2d 582 (9th Cir.1991), the Ninth Circuit concluded that it, and not the district court, had jurisdiction to consider a challenge to the Transportation Secretary's regulations requiring motor carriers to test truck drivers for drugs since the regulations were issued pursuant to the Secretary's authority under 49 U.S.C. § 3102 to regulate safety, which originally had been a function of the ICC.
 
 
 10
 The case before us is quite different from those just discussed. The function exercised by the Secretary is the function to make grants to the states. The direct source of the Secretary's authority, of course, cannot be traced to powers exercised by the ICC in 1966. It stems from the Omnibus Transportation Employee Testing Act of 1991. The only "order" issued by the Secretary was his decision approving the grant agreements. While the Secretary is to exercise his grant-making authority pursuant to the Motor Carrier Safety Assistance Program, this statute was enacted in 1983, seventeen years after Congress created the Department of Transportation. Pub.L. No. 97-424, tit. IV, 96 Stat. 2154 (1983), 49 U.S.C.App. §§ 2301-2304. None of the functions transferred from the ICC to the Secretary in 1966 involved the exercise of grant-making authority. See 49 U.S.C.A. § 1655(e)(6) (1976 ed.), repealed by Pub.L. No. 97-449, § 7(b), 96 Stat. 2413, 2444 (1983).[3] The Secretary did take over some of the Commerce Department's authority to make grants to the states. But jurisdiction to review actions challenging the exercise of that authority is in district courts. See, e.g., Block v. United States Dep't of Transp., 643 F.Supp. 762 (D.D.C.1986), rev'd, 822 F.2d 156 (D.C.Cir.1987); D.C. Fed'n of Civic Ass'ns v. Volpe, 316 F.Supp. 754 (D.D.C.1970), rev'd, 459 F.2d 1231 (D.C.Cir.), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); State of Louisiana ex rel. Guste v. Brinegar, 388 F.Supp. 1319 (D.D.C.1975).
 
 
 11
 The ultimate aim of the pilot program is doubtless the enhancement of motor carrier safety. But one must be careful not to confuse the program's objective with the function performed by the Secretary in achieving it. The dissent's basic point is that "the Secretary's actions here are indisputably in the exercise of functions authorized by then-existing statutes." Dissent at 344. Authorized by which statutes? Suppose in 1965 the ICC Commissioners came up with the idea of funding four state pilot programs of the sort we have here and observing their operations. Where would the ICC have derived the authority and the money to do this? No statute of which we are aware--and the dissent cites none--gave the ICC any authority to offer grants to states for the purpose of promoting motor carrier safety, or otherwise; no legislation appropriated funds for the ICC to divide up among the states; and no statute empowered the ICC to function as an administrator of a grant program for the states. The result is fairly obvious: since there were no such statutes prior to 1966, the function the Secretary is now performing with respect to the pilot program could not possibly be counted among those transferred from the ICC to the Department of Transportation.
 
 
 12
 The parties tell us that the pilot program "relat[es] generally to qualifications ... of [truck drivers]," a regulatory function of the ICC transferred in 1966 to the Transportation Department. 49 U.S.C.A. § 1655(e)(6)(C) (1976 ed.) (repealed and replaced by 49 U.S.C. § 3102(b), see supra note 3). The portion of the Omnibus Transportation Employee Testing Act with which we are concerned, however, did not create a federal regulatory program relating to drivers' qualifications. It stimulated four states to create their own programs with varying provisions and procedures, conducted by state officials acting pursuant to state law. Each state program is entirely financed by federal grants for the purpose of determining "the effectiveness of State-administered testing in detecting individuals." OMNIBUS TRANSPORTATION EMPLOYEE TESTING ACT OF 1991, S.REP. NO. 54, 102d Cong., 1st Sess. 34 (1991) (emphasis added). The Secretary, although supporting jurisdiction in this court, agrees that "the State Enforcement Plans describe state--not federal--laws and regulations and administrative procedures." Brief for Respondents at 32. It is the state plans that regulate safety. The fact that a state program is financed by the federal government does not convert actions taken by the state pursuant to the program into federal actions. United States v. Orleans, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); cf. Forsham v. Harris, 445 U.S. 169, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980).
 
 
 13
 The parties also reason that jurisdiction exists because the Secretary now possesses the ICC's authority, with "the assistance of all departments or bureaus of the Government and of any organization of motor carriers having special knowledge of such matter," "to investigate and report on the need for Federal regulation ... of the qualifications and maximum hours of service of employees of all motor carriers." Compare 49 U.S.C.A. § 325 (1963 ed.), repealed by Pub.L. No. 97-449, § 7(b), 96 Stat. 2444 (1983), with 49 U.S.C. § 3103. This argument fails for similar reasons. We suppose the pilot program might be characterized as an investigation. The function the Secretary is performing, however--administering federal grants--is derived from statutes passed in 1991 and 1983, not from statutes formerly administered by the ICC. Prior to 1966, the ICC could investigate the need for federal regulations, but it never had the authority to give grants to the states. In addition to authorizing the grants, the Secretary has the statutory duty to issue a report to Congress. However, the report, which comes after the programs have expired, is not what petitioners challenge. Their objection is to the states' method of gathering the data the Secretary will presumably assess.
 
 
 14
 Petitioners, although purporting to bring only a facial challenge to "the Pilot Program," have offered detailed critiques of the four rather lengthy state plans, each of which ultimately rests on the laws of the particular state. The precise focus of their complaint is not easy to discern. Many of their concerns seem to relate to the statute itself and the absence of any restraints on state actions in conducting the random testing. Whatever their focus, petitioners' challenge is not directed to the Secretary's exercise of a function formerly performed by the ICC. For that reason, this court does not have jurisdiction to hear the case under 28 U.S.C. § 2342(5).
 
 
 15
 We therefore dismiss the petition for review for lack of jurisdiction.
 
 WALD, Circuit Judge, dissenting:
 
 16
 Although I agree with the majority that this court's jurisdiction depends on whether the approval of the pilot program grants falls within a "function[ ], power[ ] [or] duty" transferred from the Interstate Commerce Commission ("ICC") to the Department of Transportation ("DOT") in 1966, I cannot agree with its unduly constricted definition of "function." I believe that the drug and alcohol testing of commercial truck drivers is indeed carried out by the Secretary in the exercise of his broad, statutorily-based "functions, powers and duties" relating to motor carrier safety. The pilot program is certainly related generally to his function of regulating motor carrier safety and more specifically to his function of investigating and reporting on the need for federal regulation of drivers' qualifications. Both of these functions were included in the 1966 transfer from the ICC to the DOT.
 
 I. THE 1966 TRANSFER AND JUDICIAL REVIEW
 
 17
 As the majority notes, the 1966 act creating the Department of Transportation provided:
 
 
 18
 Orders and actions of the Secretary in the exercise of functions, powers, and duties transferred under this chapter ... shall be subject to judicial review to the same extent and in the same manner as if such orders and actions had been by the department or agency exercising such functions, powers, and duties immediately preceding the transfer.
 
 
 19
 49 U.S.C. § 1653(c) (emphasis added). Our jurisdictional analysis accordingly must focus on two questions: First, was the solicitation and approval of the state testing programs an "order" or "action" of the kind reviewable under the Act? Second, did the Secretary implement the pilot program in the exercise of "functions, powers, and duties transferred" in 1966 from the ICC to the DOT?
 
 A. Orders and Actions
 
 20
 It seems obvious that the Secretary's entry into grant agreements with the four pilot states constitutes an "order" or "action" within the meaning of § 1653(c). The text itself shows that Congress authorized Hobbs Act review to broadly encompass "orders and actions," not merely rules or regulations. It is well-established that "orders" reviewable under the Hobbs Act include the grant of a license or other benefit, see, e.g., Airporter of Colorado, Inc. v. ICC, 866 F.2d 1238 (10th Cir.1989) (Hobbs Act review of grant of common carrier certificate), and "actions" is, if anything, broader. See Cousins v. Secretary of Transportation, 880 F.2d 603 (1st Cir.1989) (en banc) (§ 1653(c) challenge to DOT's refusal to waive, amend or modify regulation barring deaf persons from driving tractor trailers). The majority cites no indicia of congressional intent in legislative history or otherwise to restrict the ordinary meaning of these terms. Therefore, the fact that petitioners challenge not a "federal regulatory program relating to drivers' qualifications," Majority opinion ("Maj. op.") at 341 (emphasis in original), but the Secretary's actions in soliciting and approving the four pilot grants, is immaterial under § 1653(c).
 
 B. Functions, Powers and Duties
 
 21
 The second question is whether the Secretary's actions were taken pursuant to any of the "functions, powers, and duties" transferred from the ICC to the DOT in 1966.[1] Two transferred functions are particularly important here. First is the "power[ ] and dut[y] ... to regulate" motor carrier safety, including the authority to "establish reasonable requirements with respect to ... qualifications ... of [motor carrier] employees," 49 U.S.C. § 304(a)(1) (1964). Second is the power "to investigate and report on the need for Federal regulation ... of the qualifications ... of [motor carrier] employees." Id. § 325. Additionally, the predecessor ICC had been authorized "to avail itself of the cooperation, services, records, and facilities of such State authorities as fully as may be practicable, in the enforcement or administration" of any of its statutory responsibilities. Id. § 305(a)(5).
 
 
 22
 With respect to the general function of regulating motor carrier safety, the Omnibus Transportation Employee Testing Act of 1991, which launched the pilot drug-testing program, was based on congressional findings on the dangers of drug and alcohol abuse among operators in the nation's transportation systems, including truck drivers, and its legislative history was replete with references to the link between drug and alcohol testing and safety. See, e.g., S.REP. NO. 54, 102d Cong., 1st Sess. 1 (1991) ("Conference Report"). Congress specifically concluded that "[w]ith respect to the commercial motor carrier industry, the number of alcohol and drug-related accidents has been high." Id. at 3.
 
 
 23
 Section 5 of the Act, which dealt directly with testing to enhance motor carrier safety, see id. at 29, and which included both the requirement for carrier-administered, or employer, testing and the challenged pilot program, is particularly instructive. The employer testing was undertaken "in the interest of safety," id. at 1, and the pilot program was designed to complement the employer-testing program by addressing the "unique" situation of motor carrier owner-operators who "might avoid detection through the carrier-administered testing established under this legislation." Id. at 12. The pilot program was thus designed to close a potential loophole in the employer-testing program and must be deemed to fulfill the same safety function. Indeed, no court or agency has yet suggested any permissible function, other than safety, for the suspicionless drug testing of transportation employees. See, e.g., Skinner v. Railway Labor Executive Association, 489 U.S. 602, 621 & n. 5, 109 S.Ct. 1402, 1415 & n. 5, 103 L.Ed.2d 639 (1989) (upholding testing of railroad employees based on the "special needs" of protecting life and property and on the absence of proof that testing program was mere pretext for law enforcement purposes). Accordingly, I conclude that the Secretary's actions with respect to this pilot program do, indeed, come within his function--transferred from the ICC--of regulating motor carrier safety.
 
 
 24
 Second, the pilot program also falls within the Secretary's transferred function of investigating and reporting on the need for federal regulations with respect to qualifications of commercial truck drivers. 49 U.S.C. § 325 (1964 ed.).[2] As for investigation, the Secretary himself has emphasized the research and study functions the pilot program fulfills. As for reporting, the statute requires that the Secretary report to Congress on the results of the pilot program, including "any recommendations of the Secretary concerning the desirability and implementation of a system for the random testing of operators of commercial motor vehicles." 49 U.S.C.App. § 2717 note. Although Congress clearly intended for the report to address the feasibility, advisability and potential federal funding of random testing by state enforcement agencies, it expressly did not "preclude consideration" of federal testing. Conference Report at 34. The Secretary's required recommendations thus fit comfortably within his function of reporting on the need for federal regulations governing the safety qualifications of certain motor carrier employees, specifically owner-operators.
 
 
 25
 The majority, however, proposes a much narrower definition of function, arguing that the relevant "function" here is offering grants to states in a pilot program, which the Secretary was not authorized to do until after 1966. Although this position is not implausible, as the term "function" is not so clearly defined in the statute as to preclude such a reading, I ultimately find this interpretation unpersuasive for several reasons.
 
 
 26
 First, the transfer statute specifically addresses itself to the basic "functions" in the exercise of which the Secretary may take actions, and not just to the statutory authority for the particular actions he may take to implement those broader functions. The broad language of § 1653(c), which governs review of orders and actions taken in the exercise of the Secretary's inherited functions, in no way limits our review to orders or actions taken pursuant to authority granted in a then-existing statute. Cf. Maj. op. at 341 (Secretary's function not derived from "statutes formerly administered by the ICC").[3] As discussed above, it is the "functions, powers, and duties" authorized by preexisting statutes that were transferred, not the precise means of carrying them out. And the Secretary's actions here are indisputably in the exercise of functions authorized by then-existing statutes, including those "relating generally to investigation of ... service of [motor carrier] employees" and "relating generally to qualifications ... of employees." Section 6(e)(6)(B) and (C), Department of Transportation Act, H.R. 15963, 89th Cong., 2d Sess. (1966). Moreover, even though the Secretary may have lacked broad grant-making authority in 1966, the ICC was authorized to cooperate with the states in the enforcement or administration of its functions, 49 U.S.C. § 305 (1964 ed.), which is precisely what it did here through the newly-authorized pilot program.[4] It is therefore immaterial to the transfer of the safety-related function that the statute giving the Secretary authority to make grants in the exercise of that function was enacted after the 1966 transfer.
 
 
 27
 Additionally, the statutory provision adjacent to § 1653(c) strongly suggests that Congress intended "function" to denote something broader than the specific statutory authority to exercise that function. It provides: "In the exercise of the functions, powers, and duties transferred under this chapter, the Secretary ... shall have the same authority as that vested in the department or agency exercising such functions, powers, and duties immediately preceding their transfer...." 49 U.S.C. § 1653(d) (emphases added). Here, for example, this would mean that, in exercising the functions of regulating motor carrier safety, reporting on the need for safety regulations, and entering into cooperative arrangements with the states, the Secretary would not have the authority to award grants to states where the ICC did not have such pre-transfer authority. But to say that making such grants would fall outside the Secretary's authority does not mean that making such grants would fall outside the motor carrier safety function. The statute clearly allows for the later expansion of authority in the exercise of a transferred function.
 
 
 28
 Where the Secretary acts pursuant to a transferred function, I cannot believe that Congress intended for our jurisdiction to hinge on the particular means, such as funding pilot programs, by which he performs that function. If it did, the jurisdictional consequences for review of his actions would be so chaotic as not to be attributable to a rational lawmaking body. Under such a static concept of § 1653(c), whenever the Secretary carried out even the most traditional pre-1966 ICC function through a more modern, post-1966 method, courts of appeals would have no jurisdiction to review that action, and district courts, subject of course to eventual appeal in this court, would take over the initial review. Casting § 1653(c) in such a "rigid historical mold," see Schuler v. Federal Railroad Admin., 404 F.Supp. 920, 921 (S.D.N.Y.1975), could mean, for example, that courts of appeals would not have jurisdiction to review the Secretary's drug-testing regulations if the Secretary did not receive drug-testing authority from the ICC in 1966, even though the authority to regulate commercial driver qualifications was a long-standing ICC function. Moreover, if any action, including promulgating regulations, taken pursuant to a post-1966 statute were to be reviewed initially in a district court, this would involve district courts to an unprecedented extent in reviewing DOT regulations. Congress has generally reserved this task to the courts of appeals, and there is every reason to believe it attempted to do just that in § 1653(c) by continuing Hobbs Act review, which gives courts of appeals exclusive jurisdiction to review rules, regulations and final orders of the ICC. 28 U.S.C. § 2342(5).
 
 
 29
 Finally, other courts have employed the more sensible reading of § 1653(c), looking to the broader function being exercised, not to the specific means being employed. See, e.g., Owner-Operators Ind. Drivers Ass'n v. Skinner, 931 F.2d 582, 585 (9th Cir.1991) (the "fledgling Department['s] ... responsibility for ... motor carrier safety and commercial driver qualification regulations" translated into court of appeals jurisdiction to review drug-testing regulations); Cousins v. Secretary of Transportation, 880 F.2d 603, 611 (1st Cir.1989) (en banc) (regulations governing hearing requirements for drivers, which were alleged to violate the Rehabilitation Act of 1973, fit within the Secretary's exercise of the "driver safety regulation" function). In the same vein, when determining the extent and scope of judicial review under § 1653(c), courts have inquired whether "the literal language of [§ 1653(c) ] permits us to read it as accommodating" later changes by Congress, Cousins, 880 F.2d at 611, and have striven to preserve § 1653(c)'s intent by incorporating into it those subsequent legislative changes made in the review of its original operating statutes. See, e.g., Skinner, 931 F.2d at 587 ("reconciling" § 1653(c)'s provision for judicial review of DOT orders "to the same extent and in the same manner" as ICC orders to incorporate 1975 legislation redirecting ICC challenges from three-judge district courts to courts of appeals); Center for Auto Safety v. Skinner, 936 F.2d 1315 (D.C.Cir.1991) (per curiam) (same).
 
 
 30
 My belief that this is the correct reading of § 1653(c) is shared by the DOT, which itself concluded that, because the Secretary was exercising functions authorized by statutes in effect at the time of the transfer, it does not matter for purposes of § 1653(c) jurisdiction that his specific actions in implementing those functions were mandated by a subsequent statute. Instead, as the Secretary stated, "in the 1991 legislation, Congress was giving the Secretary additional authority and direction concerning performance of functions [previously] transferred from the ICC." Defendants' Memorandum in Opposition to Emergency Motion for Injunction Pending Review at 10 (Jan. 4, 1993). Moreover, "[t]here is no indication that Congress' adoption in 1991 of additional legislation relating to DOT's performance of these functions was intended to alter the manner of judicial review established by the 1966 legislation." Id. at 11.
 
 II. CONCLUSION
 
 31
 In sum, I remain convinced that soliciting and entering into the grant agreements with the states constituted "actions" or "orders" in the exercise of the Secretary's "functions, powers, and duties" to regulate motor carrier safety and to investigate and report on the need for safety regulations, which were transferred from the ICC in 1966. Review therefore comes within § 1653(c), and accordingly, we are authorized to hear this appeal. For the foregoing reasons, I respectfully dissent from the dismissal of this petition for review.
 
 
 
 [1]
 The only information about the actual operation of the pilot programs consists of an affidavit of the president of the owner-operators association, attached to the petition for review. The affidavit states that a Nebraska state trooper stopped petitioner Jones on October 23, 1992, and when she refused to take a test for alcohol and drugs, issued a citation to her; the State's attorney later dismissed the charge. The affidavit also reports that when Jones was stopped in Utah on November 14, 1992, she refused to take an alcohol test. According to the same affidavit, petitioner Betts underwent alcohol and drug testing in Nebraska on December 3, 1992, and petitioner Tuttle submitted to an alcohol test in Utah on November 12, 1992
 
 
 [2]
 According to the Secretary, New Jersey informs the driver's employer that one of its drivers refused to take the test, without giving the individual's name; the other three states give the employer the driver's name. Minnesota and New Jersey apparently impose no other sanction. In Utah, a refusing driver can be ordered out of service for 24 hours. The situation in Nebraska is unclear; Nebraska's plan is silent about the subject of further sanctions but petitioners allege, on the basis of a letter from a state trooper, that a fine and imprisonment might result from a driver's refusal to be tested
 
 
 [3]
 This repeal was pursuant to a recodification of Title 49, which was intended to "restate, without substantive change, laws enacted before Nov. 15, 1982," 96 Stat. 2443 (1983). See Cousins, 880 F.2d at 611; Owner-Operators v. Skinner, 931 F.2d at 585 & n. 3
 
 
 [1]
 The statute defines "function" to include power and duty, 49 U.S.C. § 1655(f)(2)(B)(i), so hereafter I use the term in this encompassing sense
 
 
 [2]
 Congress was well aware that its 1966 legislation shifted responsibility for safety investigations to the Secretary away from the ICC, which, however, still retained the responsibility to determine the fitness of license applicants. See S.REP. NO. 1627, 89th Cong., 2d Sess. 15 (1966) (noting concerns that the ICC would no longer have its own safety investigating staff and discussing Secretary's new responsibilities to investigate the safety compliance records of applicants for operating rights and to furnish the ICC with reports of safety compliance surveys)
 
 
 [3]
 Although the Ninth Circuit suggested in dictum that regulations enacted pursuant to post-1966 statutes might not come "within the compass of § 1653(c)," Owner-Operators Ind. Drivers Ass'n v. Skinner, 931 F.2d 582, 589 (9th Cir.1991), it expressly did not decide this question, id. at 589 n. 10
 
 
 [4]
 The majority cites cases in which the DOT's authority to make grants to the states is reviewed in the district courts. Maj. op. at 341. As the majority notes, however, those cases dealt with grant authority exercised pursuant to powers transferred to the DOT from the Department of Commerce, not the ICC. Since these powers, which primarily involve funding highway construction, never resided in the ICC, they are not candidates under the 1966 Act for Hobbs Act review. See, e.g., Miller v. United States, 710 F.2d 656, 659 (10th Cir.1983) (citing D.C. Fed'n of Civic Ass'ns v. Airis, 391 F.2d 478 (D.C.Cir.1968)) (upholding district court review of challenge to action under the Federal-Aid Highway Act). Regulating motor carrier safety, unlike building highways, was a classic function of the ICC. See Professional Drivers Council v. Bureau of Motor Carrier Safety, 706 F.2d 1216, 1217 & n. 1 (D.C.Cir.1983)